In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2095

Helen L. Russell,

Plaintiff-Appellant,

v.

Board of Trustees of the
University of Illinois at Chicago,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 96 C 8385--James B. Zagel, Judge.

Argued November 6, 2000--Decided March 8, 2001

   Before Kanne, Diane P. Wood, and Williams, Circuit
Judges.

   Diane P. Wood, Circuit Judge.  Helen Russell began
working for the University of Illinois at Chicago
Hospital (UIC) in the Finance Department (the
Department) in 1975. In this suit, she initially
accused UIC of violating both Title VII of the
Civil Rights Act of 1964, 42 U.S.C. sec. 2000e et
seq., and the Age Discrimination in Employment
Act (ADEA), 29 U.S.C. sec. 621, et seq., in
conjunction with certain discipline she received.
After some preliminary winnowing of issues, the
district court granted summary judgment for UIC
on Russell's claims of sex discrimination, sexual
harassment in the form of a hostile work
environment, and retaliation. We agree with the
district court that Russell did not present
enough evidence to go to trial on the harassment
or retaliation claims. We conclude, however, that
she met her summary judgment burden on the sex
discrimination claim, which we now remand for
further proceedings.

I

   Because this is an appeal from a grant of
summary judgment, we naturally present the facts
in the light most favorable to Russell, although
we are aware that UIC contests many of them.
Between July 1992 and July 1993, Russell's
supervisor at UIC was Thomas Margherone, the
Associate Director of Finance in the Finance and
Reimbursement Division. Even before he was

appointed to that position, Margherone had a reputation for not getting along with the female employees he supervised at UIC. When Russell and her co-workers, Nanette Aubert and Nita Marchant, heard that Margherone was being considered for the supervisory position in their department, they objected to Margherone's boss, Patrick O'Leary. O'Leary was not persuaded that Margherone would be a bad choice; he made the appointment anyway, and it was not long before the predicted tensions arose.

Matters got off on a bad note when, at one of their first staff meetings in early July of 1992, Margherone told Russell, Aubert, and Marchant (the only three people he supervised at the time) that they were the "staff from hell" and that he wished he had "three Neal Coopers," a male consultant who had more advanced accounting skills than any of the three women. Later that month, Margherone's remarks became more personal. On one occasion, he commented that he found Aubert's style of dress to be "sleazy" and that she dressed "like a whore." At another time he called Aubert a bitch and told her that she was only hired for her looks. Margherone made a similar remark to Marchant and, going further, posted a computer-generated name sign at her cubicle that included a picture of a man with a whip. During this period, Margherone took to referring to Russell as "grandma," and at the Christmas party on December 18, he told her he thought that intelligent women were unattractive.

Russell's own problems with Margherone came to a head over a time card that she submitted on December 18. On that card, Russell stated that she had worked a full day on December 17. This was inaccurate. In fact, Russell and Aubert had been attending an all-day seminar that day (perfectly legitimate in its own right), but over the lunch break, their car got a flat tire. The car was not fit to drive again until 3:30 p.m., which was too late for them to rejoin the afternoon session of the seminar. Russell testified that the misstatement was an innocent mistake, that she had filled out the card ahead of time, and that she failed to correct the mistake the next day because it was too hectic around the office. The following day, she went on vacation.

When she returned from her vacation on January 5, 1993, Margherone asked her how the seminar had gone. She volunteered that she had not attended the afternoon session because of the flat tire. When Margherone then asked her about the discrepancy on the time card, she immediately acknowledged the error and agreed to remove the three hours. At that point Russell assumed the

matter was closed. Margherone thought differently. Two days later, he gave her a pre-disciplinary action letter informing her that a disciplinary hearing would be held January 15. The letter indicated that she was subject to discipline for failure to notify her supervisor that she was taking time off and for "failure to deduct time not worked from your time record." Not surprisingly, Margherone recalls these events differently, but summary judgment is a singularly inappropriate time to resolve a "he said, she said" kind of dispute. It is enough here to note that under Margherone's version Russell was not forthcoming and admitted that the record was erroneous only when pressed. It was this attitude, Margherone testified, that led him to conclude that formal discipline was needed. In any event, between January 5 and 7 he discussed the matter with a number of other individuals at UIC, including O'Leary, Sherry Hearn (of Employee Relations), Kenneth Kombrink (of the Office of Legal Counsel), and Richard Spannraft (University Director of Personnel Services), and let them know that he thought formal discipline was in order.

On the afternoon of January 5, following their meeting, an angry Russell approached Margherone to request another meeting for herself and her two female co-workers. He agreed, and the requested meeting took place on the morning of January 7. Russell and her co-workers accused Margherone of treating them in a discriminatory manner. The meeting ended on a sour note with Margherone giving Russell her pre-disciplinary letter. Now angrier than ever, on January 15 Russell and her co-workers took their complaints about Margherone's conduct to O'Leary and Charles Stanislao, the Hospital's Chief Financial Officer. Later that day, a predisciplinary hearing was held, which Russell, O'Leary, Spannraft, and Margherone attended.

Following the January 15 predisciplinary hearing, an expanded disciplinary committee (including Stanislao, O'Leary, Spannraft, Carole Koch, and Margherone) met on January 21 and decided to suspend Russell without pay for five days. They listed three charges that justified the suspension: (1) unauthorized absence from the workplace; (2) falsification of a time record; and (3) theft of services. The committee explained in a written memo that its decision was based on the fact that "the severity of the charges warranted a suspension, and the failure of the employees involve [sic] to acknowledge any wrong doing on their part." On January 22, Russell received her disciplinary suspension notice, which repeated the three charges. She appealed the suspension, first to O'Leary and then to Personnel Services. Her argument was that

the decision to discipline her amounted to sexual harassment and was in retaliation for her complaints about Margherone's treatment of female staff members. Both O'Leary and the Personnel Services group decided that Russell's allegations were unfounded, and they affirmed the decision of the disciplinary committee. This was the first blot on Russell's record since she joined UIC.

Russell served her suspension from January 25 to January 31, 1993. In April 1993 she applied for early retirement, motivated by Margherone's mistreatment of her and her female colleagues. In July she was properly bumped from her position in the department by a more senior colleague and took an accounting position in the Physical Plant. Russell retired in 1994.

II

Russell filed charges with the Equal Employment Opportunity Commission (EEOC) on August 2, 1993. Following the issuance of a right-to-sue letter, she filed this action on December 20, 1996, alleging discrimination on the basis of sex, race, and age, as well as retaliation, all in violation of Title VII and (for the age claim) the ADEA. The district court ultimately granted summary judgment in favor of UIC on all counts. Russell appeals only the grant of summary judgment on her sex discrimination, hostile work place, and retaliation claims. Our review is under the familiar de novo standard that applies to appeals from decisions on summary judgment. Myers v. Hasara, 226 F.3d 821, 825 (7th Cir. 2000).

A.  Sex Discrimination

We begin with the claim that we are remanding for further proceedings: Russell's charge that UIC discriminated against her on the basis of sex, through Margherone's differential treatment of the gravity of the time sheet misstatement and the consequences she suffered because of it. Russell sought to establish her claim under the burden shifting method first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). The plaintiff must first establish four elements, in order to go forward: (1) she is a member of a protected class; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) the defendant treated similarly situated employees outside her class more favorably. Simpson v. Borg-Warner Automotive, Inc., 196 F.3d 873, 876 (7th Cir. 1999). If the plaintiff succeeds in demonstrating that prima facie case with evidentiary-quality materials, the burden shifts to the defendant to articulate a legitimate business justification

for the action. Once the defendant does so, the plaintiff must present sufficient evidence to create a triable issue with respect to whether this justification is pretextual. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 508 (1993).

The serious debate here focuses on the third element of that test: whether Russell presented evidence showing that she suffered a materially adverse employment action. The district court thought that she failed to do so, because a five-day disciplinary suspension was not important enough as a matter of law to satisfy this criterion. This holding, however, is not supported by our case law. To the contrary, in a number of prior decisions this very kind of disciplinary suspension has been found to be a materially adverse employment action for purposes of the prima facie case. In Conley v. Village of Bedford Park, 215 F.3d 703, 709 (7th Cir. 2000), this court said that "there is no dispute that a [nine-day] suspension constitutes an adverse employment action." In Biolchini v. General Elec. Co., 167 F.3d 1151, 1154 (7th Cir. 1999), it was undisputed that a one-week disciplinary suspension was a materially adverse employment action, and in Silk v. City of Chicago, 194 F.3d 788, 800 (7th Cir. 1999), a five-day disciplinary suspension was considered materially adverse. It is equally true that "minor or trivial actions that make an employee unhappy," 194 F.3d at 800, do not constitute materially adverse employment actions, but a formal disciplinary suspension is much more than that. Russell lost five days of pay, and this was arguably the least of her injuries. After maintaining a spotless employment record for 30 years, her record now includes a formal finding that she "falsified" her time records and committed "theft of services." These are not trivial charges, and both UIC and any prospective employer who inquired into her employment history would surely hold them against her when making employment related decisions.

The case on which the district court relied, Williams v. Bristol-Myers Squibb, Co., 85 F.3d 270 (7th Cir. 1996), did not involve discipline and thus sheds little light on Russell's situation. In Williams, the court had to decide when an otherwise non-disciplinary employment action might nonetheless be considered adverse. The plaintiff claimed that a neutral-seeming lateral transfer that resulted in a reduction in his commission income was really (because of the income effect) a demotion. We held that while the "question is close," "an indirect and minor effect on commission income (minor here because commission income was only a small fraction of the employee's total income) is not sufficient to transform a lateral transfer into a demotion."

Id. at 274. Russell's situation is entirely different, because she experienced an employment action that was avowedly disciplinary, with its attendant consequences for her pay and her permanent employment record. The comments in Williams about the proportion of income lost were not directed to a situation like hers, as the post-Williams cases mentioned above illustrate.

The district court found that Russell had satisfied all the other elements of her prima facie sex discrimination claim and we agree. UIC takes issue with the court's conclusion that Russell satisfied element 4 (similarly situated person outside her protected class that was treated differently), but we believe the district court correctly assessed this evidence. Russell pointed to similar time sheet error incidents involving Margherone and Miroslaw Buchman, both males, where no disciplinary action was taken. UIC may be correct that Margherone, as a salaried employee subject to different time-keeping requirements, was not similarly situated to Russell, but Buchman was. UIC's best argument against this conclusion is that Buchman, unlike Russell, immediately acknowledged his error when confronted by Margherone and apologetically explained that it was an innocent mistake. But this is precisely what Russell testified that she did as well. In order to accept UIC's argument, we would have to credit Margherone's version of the incident over Russell's, which we obviously cannot do on a motion for summary judgment.

For the same reason, we agree with the district court that Russell has offered sufficient evidence of pretext to survive summary judgment. UIC's articulated justification for its action was that Russell was punished because the committee honestly believed that she had falsified her time sheet and committed theft of services. But the committee's own action was tainted because of Margherone's participation in the decision. As the district court recognized, any improper motives Margherone harbored had to be imputed to the other members of the disciplinary committee because of Margherone's extensive role in initiating and carrying out the disciplinary process. UIC has not challenged that holding on appeal. Russell's testimony that her response to the time sheet incident was the same as Buchman's, but that she suffered distinctly worse consequences, suffices to raise a genuine issue of fact on the issue of pretext.

Because Russell has offered enough evidence to allow a jury to conclude that UIC's reason for disciplining her was pretextual, she is entitled to have a jury decide whether, in the final analysis, she was the victim of sex

discrimination--an issue, we add, on which she will of course have the burden of proof at all times (just as she did throughout the shifting burdens of production that make up the McDonnell Douglas waltz).

B.  Hostile Work Environment

Even after Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775 (1998), the idea of discriminatory conduct that creates a hostile work environment continues to play a useful part in the law, even if it no longer serves an important function in determining the rules for vicarious liability. See, e.g., Gentry v. Export Packaging Co., 238 F.3d 842 (7th Cir. 2001). In order to survive summary judgment on a hostile work environment claim, a plaintiff must present evidence that would establish that the allegedly hostile conduct was so severe or pervasive as to create an abusive working environment in violation of Title VII. Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997). In assessing the severity and pervasiveness of the conduct, we look to all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Smith v. Sheahan, 189 F.3d 529, 533-34 (7th Cir. 1999).

The district court based its decision to grant summary judgment on this claim in part on its conclusion that it could only properly consider evidence of Margherone's conduct after October 25, 1992. Russell did not file her Title VII complaints until August 2, 1993. In general, a plaintiff may challenge only discriminatory conduct that occurred within 300 days of the filing of her complaint. See Foster v. Arthur Andersen, L.L.P., 168 F.3d 1029, 1035 n.9 (7th Cir. 1999). Hostile environment claims, however, are often different from complaints about a specific action like a firing or a refusal to promote that happen at a particular time. It is commonly the case that the plaintiff must instead demonstrate that the harm about which she is complaining is part of a pattern of conduct, and she "was reasonable not to perceive her working conditions as intolerable until the acts of harassment had, through repetition or cumulation, reached the requisite level of severity." DeClue v. Central Ill. Light Co., 223 F.3d 434, 435-36 (7th Cir. 2000). Russell believes that the district court erred in not treating her evidence this way, and we are inclined to agree with her. Even giving her the benefit of that doubt,

however, we nonetheless conclude that UIC was entitled to summary judgment on this claim.

Reading the record in the light most favorable to Russell, one finds evidence of offensive behavior and boorish comments and signs, but nothing exceeding that level. This is not enough to sustain a claim of discrimination on a hostile environment theory. See Minor v. Ivy Tech State College, 174 F.3d 855, 859 (7th Cir. 1999). Margherone's demeaning habit of referring to Russell as "grandma," his ridiculous idea that all intelligent women are unattractive, his comment about the "staff from hell," and his rude episodes of calling each of Russell's female colleagues a bitch at least once, are hardly admirable. Nor were his comments to Aubert that she dressed "sleazy" and "like a whore," and that she had been hired for her looks.

But the discrimination laws do not mandate admirable behavior from employers, through their supervisors or other employees. Instead, the law forbids an employer from creating an actionably hostile work environment for members of protected classes. Russell has not offered evidence from which a reasonable trier of fact could conclude that the environment in her department of UIC violated the law. Indeed, most of Margherone's offensive conduct was directed not to Russell but to her co-workers. When harassing statements are "directed at someone other than the plaintiff, the impact of [such] 'second hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." McPhaul v. Board of Commissioners, 226 F.3d 558, 567 (7th Cir. 2000) (internal quotations and citations omitted). The statements directed to Russell were few and far between, they were not physically intimidating or threatening, they were not sexually suggestive, and while they may have been offensive, they were not so offensive as to constitute actionable conduct. See, e.g., Pryor v. Seyfarth, Shaw, Fairweather & Geraldson, 212 F.3d 976, 977 (7th Cir. 2000) (holding that several comments suggesting male boss would like to see his female secretary in sexually provocative outfits were insufficient to create objectively hostile work environment); Ngeunjuntr v. Metropolitan Life Ins. Co., 146 F.3d 464, 467-68 (7th Cir. 1998) (relatively isolated comments suggesting bias against ethnic minorities insufficient to survive summary judgment). Compare Hostetler v. Quality Dining, Inc., 218 F.3d 798, 807-08 (7th Cir. 2000) (uninvited kiss, attempt to remove bra, and lewd proposition for sex clearly sufficient to state claim for harassment).

The few statements Margherone made to Russell's

co-workers, in particular to Aubert, were arguably more serious and might have been grounds for them to bring a claim, see McDonnell v. Cisneros, 84 F.3d 256, 259 (7th Cir. 1996) (recognizing that claims that female employee is a "whore" may make workplace intolerable), but Russell does not allege that she was ever called a whore or a bitch. As we reiterated recently in a similar situation involving racial discrimination, "'the mere utterance of an . . . epithet which engenders offensive feelings in an employee' is not sufficient to establish a hostile work environment." McPhaul, 226 F.3d at 568, quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993). The district court properly granted summary judgment on this claim.

### C. Retaliation

Last, Russell alleges that UIC suspended her for five days in retaliation for her complaint to Margherone and his supervisor, O'Leary, about Margherone's mistreatment of female employees. Lacking any direct evidence of retaliatory intent, Russell again seeks to fit her claim within the McDonnell Douglas framework. A prima facie case of retaliation under Title VII requires the plaintiff to present sufficient evidence that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) there is a causal link between the protected expression and the adverse action. Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7th Cir. 1998). If the plaintiff gets this far, the defendant must then come forward with a legitimate business reason for taking the employment action; if it does so, the plaintiff may survive summary judgment only by presenting sufficient evidence that the defendant's justification is pretextual.

The district court granted summary judgment to UIC on the ground that Russell had no evidence that there was a causal link between her complaint to Margherone about his behavior and the discipline she received. We agree. By the time Russell and her colleagues complained to Margherone about his conduct, on the morning of January 7, 1993, the disciplinary process was already well underway. This was two days after Margherone met with Russell to discuss the misstatement on her time sheet. The unrebutted evidence presented by UIC is that Margherone decided on January 5 to seek formal disciplinary measures against Russell. Between January 5 and 7, he took steps to do so, consulting with Hearn, Kombrink, O'Leary, and Spannraft. As the district court pointed out, by the time Russell met with Margherone on the 7th, he had already prepared

the disciplinary action letters. On these facts, there can be no inference that Margherone's own decision to discipline Russell was causally related to her protected activity. (Indeed, neither O'Leary nor Spannraft, both of whom learned about the problem before January 7 and later participated in the final disciplinary hearing, would have had their assessments of the situation tainted by the yet-to-be-voiced complaint either.)

Because UIC's liability is vicarious, it cannot be held liable for something that would not stick to Margherone himself. This is true even if others eventually participated in the decision to impose discipline, which was the case here. There is no evidence that the other members of the committee had any reason to believe that Margherone had triggered the disciplinary proceeding for retaliatory reasons, nor is there any evidence that they were aware of her complaint. On this record, UIC cannot be held liable on a retaliation theory.

III

For these reasons, we AFFIRM the district court's judgment granting summary judgment in favor of UIC on Russell's hostile work environment and retaliation claims. We REVERSE the judgment on her sex discrimination claim and REMAND for further proceedings, because we conclude that the five-day disciplinary suspension she suffered was enough to constitute an adverse employment action for purposes of Title VII, and we find no other alternate ground on which to affirm. Each party shall bear its own costs on appeal.