In the
United States Court of Appeals
For the Seventh Circuit

No. 00-4219

Sylvia Curry,

Plaintiff-Appellant,

v.

Menard, Inc.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 8333--George W. Lindberg, Judge.

Argued April 25, 2001--Decided October 29, 2001

   Before Coffey, Manion, and Rovner, Circuit
Judges.

   Manion, Circuit Judge.  Sylvia Curry
filed suit under Title VII of the Civil
Rights Act of 1964, 42 U.S.C. sec. 2000e,
et seq., and 42 U.S.C. sec. 1981,
alleging that her employer, Menard, Inc.,
discharged her because of her race. The
district court granted summary judgment
for Menard and Curry appeals. We vacate
the judgment of the district court and
remand for further proceedings.

I.  Background

   Curry, who is black, started working as
a cashier at Menard's Skokie, Illinois
store in January 1996. Menard terminated
her in March 1998. While the alleged
cause of her termination was her third
cash drawer discrepancy, Curry claims
that it was due to her race. From the
onset of her employment, Curry claims she
did not have a good relationship with her
immediate supervisor, Susan Horvath, who
was the office manager in charge of
cashiers throughout Curry's tenure at the
Skokie store. Their relationship
allegedly became even more strained in
June or July 1997 when Curry confronted
Horvath about certain comments and
actions by Horvath that Curry thought
inappropriate and racially motivated.
Specifically, according to Curry's
testimony (which was disputed by Menard),

Horvath had a practice of calling the store's department managers and security personnel to warn them when black or Hispanic customers came into the store. Curry testified that she overheard such phone calls at least 10 to 20 times. Curry further testified that Horvath once stated that "blacks don't like to work as much as Mexicans" and that "Mexicans will work for little or nothing." She also allegedly asked Curry to explain why black customers would wear weaves or extensions in their hair and commented once on the "naps" in the hair of a black employee. When Curry confronted Horvath about these actions and statements, Horvath allegedly did not respond and continued to make what Curry perceived to be inappropriate comments.

In March 1998 the assistant store manager, Timm McDaniel, informed Curry that she was being discharged for violating the store's unwritten "progressive discipline" policy. The terms of this policy were as follows: every day the cash in each cashier's register would be counted and compared against a master computer printout. The first time a cashier's register count differed from the printout by $3.00 or more, the cashier would receive a written warning. If another discrepancy occurred within 30 days of receipt of the written warning, the cashier would be suspended. A third discrepancy occurring within 60 days from the suspension would result in termination.

The parties do not dispute that Curry's register had cash discrepancies of more than $3.00 on January 4, February 9, and February 28 of 1998. Curry believes that her termination was at least partially motivated by Horvath's attitude toward minorities in general and toward her in particular. In fact, Horvath herself discovered the January 4 discrepancy, in the amount of $12.37, and attempted to reconcile the shortage. According to Horvath's testimony, however, her efforts were unsuccessful, and she therefore issued a written disciplinary warning on January 13. Horvath did not speak to any other managers prior to taking such action. Indeed, as the parties agree, it was assistant manager McDaniel's practice to allow Horvath to take disciplinary action on her own when cash discrepancies were involved.

Horvath also counted down Curry's cash drawer on February 9 and found a $21.47 discrepancy. After both Horvath and Curry were unsuccessful in their attempts to reconcile the difference, Horvath wrote up a suspension form. She then consulted with McDaniel, and together they talked to Curry and suspended her for three days.

On February 28 assistant office managers Tammie Davis and Matthew Rosner counted down Curry's drawer and discovered a discrepancy of $5.70. At that time Rosner had not yet been instructed on the store's disciplinary policy. He therefore proceeded to consult with Horvath, whoinformed him about the proper discipline to be imposed. Soon thereafter, on March 6, McDaniel terminated Curry for violating the progressive discipline policy. According to McDaniel he discharged Curry based solely on the three writeups he had received, without investigating their validity or whether they were issued in an even-handed manner. In fact, McDaniel testified that he never exercised his own discretion in disciplining an employee for cash discrepancies, relying instead on the recommendations he would receive from Horvath.

From January 1, 1997, to December 31, 1998, Curry was the only cashier to be suspended or terminated for violating the store's progressive discipline policy. The record shows, however, that had the policy been strictly enforced sixteen other cashiers should have been suspended or terminated in that same time period. Although Menard asserted in its statement of facts submitted pursuant to Northern District of Illinois Local Rule 56.1(a)(3)(B) that it did not know the race of eight of those sixteen individuals, it conceded that only one of the others was black. The record also establishes that out of a total of 35 cashiers employed by the Skokie store, only three, including Curry, were black. The record does not indicate how many among these numbers were Hispanic. Nevertheless, at least fourteen of those sixteen cashiers were not black.

Menard maintains that Curry's termination was the result of a new stricter approach to cashier discipline

that was imposed on January 5, 1998, when new manager Michael Stanley began working at the store. Regardless of their race, it appears that the 14 cashiers who could or should have been suspended or terminated before January 5, 1998 and after May 12, 1998 were not so disciplined. However, the record shows that during the short time period that Stanley was manager (January 5, 1998, to May 12, 1998), one employee, Anne Mercurio, who was not black, had two cash discrepancies within a 30-day period. Another non-black employee, Margaret Venetico, had three discrepancies within the applicable time period. Although Mercurio and Venetico received written warnings, neither was suspended or discharged.

## II.  Discussion

We review a grant of summary judgment de novo, construing the evidence in the light most favorable to the nonmoving party. Gordon v. United Airlines, Inc., 246 F.3d 878, 885 (7th Cir. 2001). Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Id.

As the district court correctly noted, Curry failed to provide any direct evidence of discrimination. Although Curry testified to "inappropriate" racial remarks made by Horvath, those remarks, while made in Curry's presence, were not made to or about her and were not related to the employment decision in question. See Gorence v. Eagle Food Ctrs., Inc., 242 F.3d 759, 762 (7th Cir. 2001) (stray remarks of a derogatory character do not show direct discrimination unless they are related to the adverse employment action). Thus, to survive summary judgment Curry had to prove a prima facie case of discrimination under the burden-shifting method, which required her to show that: (1) she belongs to a protected class, (2) she performed her job according to Menard's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside the protected class were treated more favorably. Gordon, 246 F.3d at 885-86. Establishing a prima facie case creates a presumption of discrimination and shifts the burden to the employer to produce evidence of a

legitimate, race-neutral reason for the adverse action. Id. at 886. If the employer meets this burden of production, the plaintiff then has the burden to show that the stated nondiscriminatory reason is pretextual. Id.

The parties do not dispute that elements (1) and (3) of the prima facie test were met. Thus, in determining whether Curry established a prima facie case, we need consider only whether she was meeting Menard's legitimate expectations and whether similarly situated non-black employees received more favorable treatment.

Menard maintains that Curry was not meeting its legitimate performance expectations because she had accumulated three violations under the store's progressive discipline policy. On this point, however, the facts of this case are similar to those in Flores v. Preferred Technical Group, 182 F.3d 512, 515 (7th Cir. 1999). In Flores the plaintiff, an Hispanic woman, was discharged for participating in an unlawful work stoppage. Id. at 514. Although admitting she had broken the rules, the plaintiff claimed that she had been disciplined more harshly than non-Hispanic rule-breakers. Id. at 515. The employer argued from this that the plaintiff was not fulfilling its legitimate expectations because when she was fired she was admittedly participating in the unlawful work stoppage. Id. This court reasoned, however, that such an argument fails to take into account the flexibility of the McDonnell Douglas analysis. Id. Rather, where the issue is whether the plaintiff was singled out for discipline based on a prohibited factor, it "makes little sense . . . to discuss whether she was meeting her employer's reasonable expectations." Id.; accord Oest v. Ill. Dep't of Corr., 240 F.3d 605, 612 n.3 (7th Cir. 2001) ("legitimate expectations" prong of the prima facie test is not necessary to the analysis, where the people judging the plaintiff's performance were the same people she accused of discriminating against her). Thus, the plaintiff in Flores did not have to show she was meeting the employer's legitimate expectations to establish a prima facie case of discrimination.

Similarly here, although Curry admits that she violated Menard's policy, she claims that she was disciplined more harshly than non-black employees who also violated the policy. As in Flores, therefore, it makes little sense in this context to determine whether she was meeting Menard's legitimate expectations. Rather, Menard's argument is more appropriately considered in our analysis of pretext. See Vakharia v. Swedish Covenant Hosp., 190 F.3d 799, 807 (7th Cir. 1999) (court can assume that the plaintiff has met the "legitimate expectations" element of the prima facie test where that element dovetails with the issue of pretext).

We therefore turn to the last element of the prima facie test: whether Curry showed that she was treated differently than similarly situated employees not in her protected class. Curry's evidence, which included a series of daily cash flow reports documenting cash discrepancies for Menard's cashiers, established that from January 1, 1997, to December 31, 1998, sixteen other individuals, at least fourteen of whom were not black, should have been suspended or terminated under Menard's progressive discipline policy, if the policy had been strictly enforced. Curry claims that this evidence proved that at least fourteen similarly situated employees outside her protected class were treated more favorably by Menard. But this statistic does not tell the whole story. Whether the discipline policy was enforced depended on who was managing the store, and all but two of the sixteen violations that Curry cites occurred either before or after the tenure of Michael Stanley, who Horvath testified was brought to the Skokie store to improve discipline and the store's general operation. Before Stanley showed up, several preceding store managers had not enforced the policy. In fact, Curry herself had three cash discrepancies in 1997 (on February 16, May 24, and August 17), but she was not disciplined. Further, as Curry concedes, no one else was disciplined before Stanley arrived. And after he left, the store returned to its lax enforcement.

This leaves in question the four-plus months that Stanley was in charge. For that limited time period Curry offered

sufficient evidence to survive summary judgment because she established that two employees--Margaret Venetico and Anne Mercurio--had two or more cash discrepancies during Stanley's tenure at the store but were neither suspended nor terminated. See Russell v. Bd. of Tr. of the Univ. of Ill. at Chi., 243 F.3d 336, 342 (7th Cir. 2001) (female employee alleging sex discrimination satisfied "similarly situated" element of prima facie test by presenting evidence that one male employee was treated more favorably by the employer). Although Menard asserts that Curry did not present any evidence regarding the race of those other two cashiers, Menard admitted in its Rule 56.1 response that neither Mercurio nor Venetico is black. Menard further maintains that Curry failed to show whether Venetico and Mercurio were in fact disciplined, but this argument is directly contradicted by several pieces of evidence in the record. First, Menard admitted in its Rule 56.1 response that Curry was the only cashier terminated for cash drawer discrepancies between January 1, 1996, and December 31, 1998. Obviously that includes the several months still in question. The record also contains a letter from Menard to the Illinois Department of Human Rights stating that no employee except for Curry was suspended or terminated for cash register errors from 1996 through 1998. And finally, in response to an interrogatory asking for identification of every instance of cashier discipline during the period of January 1, 1997, to December 31, 1998, Menard stated that each instance was reflected in the documents it produced. None of those documents contains evidence that any cashier other than Curry was suspended or discharged.

   Menard also argues that without knowing the background circumstances behind each cash discrepancy, no conclusion can be made as to what discipline should have been imposed. In other words, Menard asserts that the discrepancies referenced in the cash flow reports could have been later reconciled or found to be not attributable to cashier error, in which case disciplinary action would not have been appropriate. But as the moving party, the burden was on Menard to present evidence showing that the cash flow reports were reconciled, cancelling any need for disciplinary action. At that

point any presumption of discrimination would drop and Curry must then prove pretext. See Crim v. Bd. of Educ. of Cairo Sch. Dist. No. 1, 147 F.3d 535, 540 (7th Cir. 1998). But Menard failed to meet that burden of production. Most of the reports in fact state that the discrepancies were due to "cashier error," with some providing more detailed explanation such as cashier "gave incorrect change." Furthermore, Horvath testified that when a discrepancy was discovered she would conduct an investigation to determine the cause, and only after the investigation was complete would she write an explanation for the discrepancy on the cash flow report. Horvath's testimony therefore contradicts Menard's allegation that some cash flow reports show the final results of a drawer count, while others reflect discrepancies that may be reconciled at some later, unspecified time.

For similar reasons we conclude that Curry presented sufficient evidence of pretext to preclude summary judgment. Menard's proffered nondiscriminatory justification for Curry's termination is that it was simply following its uniform disciplinary policy, which was being strictly enforced during Stanley's tenure at the store. But as discussed above, Curry presented evidence that Mercurio and Venetico, both non-black cashiers, were not suspended or terminated despite the fact that they also accumulated at least two cash discrepancies during the same time period. This inconsistency creates a genuine issue of material fact as to whether Menard's stated reason for discharging Curry was a pretext for discrimination. See Gordon, 246 F.3d at 892 ("A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, nondiscriminatory reason for the adverse job action was a pretext for racial discrimination.") (quotation marks and citation omitted); Russell, 243 F.3d at 342 (female employee presented genuine issue of material fact as to whether employer's stated nondiscriminatory reason for suspending her--that she falsified her time sheet-- was pretextual; employee pointed to similar time sheet error incidents involving male employees, where no disciplinary action

was taken); Lynn v. Deaconess Med. Ctr., 160 F.3d 484, 488-89 (8th Cir. 1998) (male employee produced sufficient evidence of pretext to survive summary judgment, where he showed that employer disciplined similarly situated female employee less severely for more egregious conduct); Williams v. City of Valdosta, 689 F.2d 964, 975 (11th Cir. 1982) ("It is undisputed . . . that the City's adherence to its formal promotional policy was inconsistent and arbitrary at best. This inconsistency supports the conclusion that resort to the [policy] was a pretext for singling out Williams for unfavorable treatment.").

In short, before and after Stanley's term as manager, none of the cashiers who had discrepancies, including Curry, was disciplined under the "progressive discipline" policy. But during Stanley's tenure there were apparently three violators, but only Curry was fired. This leaves a material question of fact of whether terminating Curry for breaching the policy was a pretext.

As a final note we emphasize that on remand nothing prevents Menard from presenting further evidence comparing Curry's violations to those of Mercurio and Venetico. If despite the distinctions among them Menard still can marshal undisputed evidence establishing the existence of a policy that was even-handedly applied, then summary judgment may yet be appropriate. But if there remains a dispute as to whether Curry was treated more harshly than the other two for like violations, a jury should decide.

The judgment of the district court is VACATED, and the case is REMANDED for further proceedings.

Rovner, Circuit Judge, concurring in the judgment. Like the majority, I believe that Curry presented enough evidence to raise a material dispute as to whether similarly situated, non-African American employees received preferential treatment from Menard. I disagree, however, with the majority's conclusion that the number of potential comparatives is necessarily limited to those individuals who had cash

discrepancies during Michael Stanley's approximately four-month tenure at the store. The majority rests its decision on the assumption that Stanley intended to enforce the progressive discipline policy more strictly while he was in charge. But that point is disputed. For instance, Curry presented testimony from assistant manager McDaniel (who started working at Menard one month after Stanley) that he never discussed the progressive discipline policy with Stanley or Horvath and could not recall any conversations he had with Horvath to the effect that the new manager wanted to "get tougher" on employees. Assistant office manager Rosner also testified that neither Stanley nor McDaniel ever spoke to him about the policy and that the policy was never discussed at any manager meeting. And, as the majority acknowledges, even while Stanley was in charge there were two non-African American employees, Mercurio and Venetico, who should have been disciplined but were not. In fact, the only evidence supporting the majority's assumption is hearsay of questionable admissibility--Horvath's testimony that Stanley told her the policy was to be rigidly enforced--and, even more dubious, Curry's "admission" during her deposition that there was a "rumor going around" that Stanley was brought in to tighten up discipline. Curiously, Menard did not offer any testimony from Stanley himself (or for that matter from McDaniel, who was second-in-charge) that Stanley had implemented a policy of strict enforcement. Thus, in light of all the evidence of record and our obligation to view it in the light most favorable to Curry, I think that the majority unduly restricts the relevant time frame to the four-month period when Stanley was managing the store. I therefore respectfully disagree with that portion of the majority's decision.

I offer two additional comments. First, regardless whether the number of other similarly situated individuals is 2 or 16 for purposes of the prima facie test, I note that nothing precludes Curry from offering evidence of all 16 at trial. As we have often stated, the burden-shifting approach of McDonnell Douglas applies only to pretrial proceedings and drops out once a case goes past the summary-judgment stage. E.g., Hamner v. St.

Vincent Hosp. and Health Care Ctr., Inc., 224 F.3d 701, 705 n.3 (7th Cir. 2000); Hasham v. Cal. State Bd. of Equalization, 200 F.3d 1035, 1044 (7th Cir. 2000); Diaz v. Fort Wayne Foundry Corp., 131 F.3d 711, 712 (7th Cir. 1997).

Second, although I agree with the majority that Curry's testimony regarding Horvath's racial remarks was not direct proof of discrimination, that should not prevent Curry from introducing the same evidence to prove pretext should Menard renew its motion for summary judgment. Pafford v. Herman, 148 F.3d 658, 666 (7th Cir. 1998); Huff v. UARCO, Inc., 122 F.3d 374, 385 (7th Cir. 1997). Menard argues otherwise, citing cases such as Hong v. Children's Memorial Hospital, 993 F.2d 1257 (7th Cir. 1993), for the proposition that, before a plaintiff may rely on circumstantial evidence, she must show that there is a nexus between that evidence and the allegedly discriminatory decisions at issue. But those cases simply hold that such circumstantial evidence, without more, is insufficient to give rise to an inference of discrimination. See, e.g., id. at 1266. And here, Curry's circumstantial evidence was not offered alone but in conjunction with other proof of pretext. See Huff, 122 F.3d at 385 ("When a plaintiff uses the indirect method of proof, no one piece of evidence need support a finding of . . . discrimination, but rather the court must take the facts as a whole.").

Menard also contends that Horvath's comments may not be considered because she "was not even present when Curry was terminated and there is no evidence whatsoever that either of the managers who were present (McDaniel or Rosner) had made any derogatory comments or acted in any way which would even suggest that their actions were motivated by racial animus." But Menard does not dispute that Horvath personally imposed the written warning and the suspension on Curry (actions upon which the termination was based), and that Rosner, who discovered Curry's third cash discrepancy, consulted with Horvath about the proper disciplinary action to be taken. Furthermore, McDaniel testified that he exercised no discretion in determining whether to discipline an employee for cash discrepancies; instead, he based his decisions solely on the writeups he would

receive from Horvath, without investigating their validity or whether they were issued in a consistent manner. Horvath was therefore in effect the decision-maker in Curry's termination, and so evidence of any racial animus she harbored may be considered in the pretext analysis. See Russell v. Bd. of Tr. of the Univ. of Ill. at Chi., 243 F.3d 336, 342 (7th Cir. 2001) ("[A]ny improper motives [the plaintiff's supervisor] harbored had to be imputed to the other members of the disciplinary committee because of [that supervisor's] extensive role in initiating and carrying out the disciplinary process."); Hunt v. City of Markham, Ill., 219 F.3d 649, 652 (7th Cir. 2000) (expressions of discriminatory feelings by "those who provide input into the [adverse employment] decision" are evidence of actionable discrimination).