Lisa A. PTASNIK, Plaintiff–Appellant,

v.

CITY OF PEORIA, DEPARTMENT OF POLICE, Defendant—Appellee.

No. 03–2715.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 27, 2004.

Decided March 3, 2004.

Carol Hansen Posegate, Posegate & Denes, Springfield, IL, for Plaintiff–Appellant.

Tracy C. Litzinger, Howard & Howard, Randall Ray, Peoria, IL, for Defendant–Appellee.

Before KANNE, EVANS, and WILLIAMS, Circuit Judges.

## ORDER

Lisa Ptasnik sued the Peoria Police Department under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, alleging that the Department discriminated against her on the basis of sex by repeatedly rejecting her application for a transfer, creating a hostile work environment, and retaliating against her after she filed suit. The district court granted summary judgment for the city on all three claims. We affirm the district court's grant of summary judgment.

Ptasnik began working for the Department in 1993. In 1995 she was assigned to a walking beat, and the following year she joined the Gang Unit. Subsequently she became part of the Street Crime Unit.

Ptasnik applied for a transfer in the Special Investigations Division, Vice and Narcotics (Vice Unit), four separate times between 1996 and 1999, but each time she was passed over in favor of one or more male officers. When Ptasnik first applied for transfer in 1996, the Department told her that she was not eligible for transfer, because she first needed to serve three years in the Street Crimes Unit. (But there is a question as to whether this rule applied to others: male applicants were transferred in the Vice Unit both in 1996

and in 1999, without having first served three years in the Street Crimes Unit.) Ptasnik's second and third applications for transfer in 1997 and 1999 were also unsuccessful, but the record does not reflect any reason these transfers were denied.

In December 1999, Ptasnik's fourth application for transfer was denied because she had been suspended for insubordination several months earlier for failing to properly account for funds paid to an informant, and departmental policies prohibited her transfer within one year of suspension. (Curiously, too, a male officer, Jerry Bainter, was promoted in 2000 to Sargent, despite also having been suspended within the year for making sexually offensive comments in Ptasnik's presence.) Ptasnik believed that her non-transfer in 1999 was also a result of what the department characterizes on appeal as "behavioral problems." She surmises that this unfavorable characterization stems from a series of controversial incidents she had with the department during her tenure (concerning for instance comments she once made at a press conference indicating that the Department lied to the media; an opinion rendered by the State's Attorney's office at the time of her transfer request, stating that it did not believe Ptasnik would be a "credible witness" were she to appear in court; and "bad blood" that resulted when she upstaged the Vice Unit by making more arrests in a day as an undercover prostitute than the Vice Unit had made all year).

Ptasnik had a solid arrest record and her supervisors commented highly on her work. Her supervisor testified that Ptasnik was above average in her police work and in her attitude toward work: She was a "very energetic and aggressive police officer, ... willing to go out and arrest the gang bangers and the dope dealers."

Moreover, at the time she applied for transfer in December 1999, she had the most arrests out of any of the applicants.

Ptasnik also presented evidence that her work environment was hostile. Ptasnik claims that she heard from other officers about many false rumors regarding her sexual life. The record reflects that she complained about these rumors to her supervisor and to another unspecified person in 1995, 1997, and 2000. In 1994 or 1995 rumors spread about sexual liaisons she was having with Officers King, McDaniel, Glasper, and Cook. In 1997 rumors linked her to liaisons with Chief Kelly. Later that same year another rumor connected her to Captain Button. In 1998 Captain Dickerson suggested to Ptasnik that she had a direct line to the hotel room of her superior Officer, Lt. Papis, and joked that if they were married her name would be "Papipasnik." In 2000, a rumor circulated that she was sexually involved with Councilman Nichting.

Ptasnik also says that during the 1995 holiday season her supervisor told her that she looked so good he "could fuck her." In addition, she was offended by male officers habitually directing offensive comments to other women. Ptasnik complained repeatedly to the Equal Employment Representative, Kimberly King, that while on duty, she heard men telling stories about sexual activity, ruminating on what sex with particular women in police custody would be like, and referring to women as "bitch," "cunt," "whore," or "slut."

Ptasnik remained in the Street Crimes Unit until February 2000 when a work-related shoulder injury led to a series of surgeries. Even after these surgeries, the injury caused Ptasnik a great deal of pain. Her supervisors decided that it would be unsafe for her to continue working in the Street Crimes Unit, because the injury prevented her from firing a gun. After five months of paid leave, the Department assigned her in August 2000 to "light duty," which did not require her to be able to fire a gun.

Although the details are murky, after her shoulder injury Ptasnik told the Police Union Representative that she was suffering from stress so severe that she could not perform her regular job duties and needed time off. Because the representative believed Ptasnik might even be suicidal, he requested an emergency meeting to ask that she be placed on administrative leave. Chief Stenson granted her request for leave.

In October 2000, eight weeks after she filed her complaint of discrimination in the district court, the Department put Ptasnik's on administrative leave. One year later, Ptasnik reinjured her shoulder at the police firing range in an attempt to qualify for a return to full duty. She left the police department in April 2002, on disability status related to her shoulder injury.

The district court dismissed her discrimination claims on summary judgment, concluding that: 1) she could not establish a prima facie case of disparate treatment because she could not show that she was qualified for the job (she could no longer fire a gun) and because she could not identify any officer who was similarly situated; 2) her work environment was not sufficiently "hellish" to be considered hostile; and, 3) the department's decision to place her on leave was not retaliation for the lawsuit, but rather was due to her inability to fire a gun.

We review de novo the district court's decision to grant summary judgment to the Department. *Oest v. Ill. Dep't. of Corr.*, 240 F.3d 605, 610 (7th Cir.2001). Under Rule 56(c) of the Federal Rules of

Civil Procedure, summary judgment may be granted if there remains no genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We review the facts in the light most favorable to the nonmoving party, to determine whether there remains a material issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Ptasnik asserts on appeal that she presented sufficient evidence of disparate treatment based on sex to raise an issue of material fact for trial. Ptasnik did not present direct evidence that she was denied a transfer or suspended as a result of discrimination. She could show discrimination under the *McDonnell Douglas* indirect method of proof, however, if she could establish that she: 1) belongs to a protected class; 2) applied for and was qualified for a position; 3) was rejected for that position, and suffered a materially adverse employment action; and 4) was passed over for someone similarly situated but not in her protected class. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Oest* at 612.

Ptasnik challenges the district court's conclusion that she couldn't meet the second prong of the *McDonnell Douglas* test, namely that she was not qualified for the allegedly discriminatory non-transfer because her shoulder injury prevented her from firing a gun—a requirement of the job. Ptasnik claims that her shoulder injury did not affect her qualification for the job because her shoulder injury occurred in February 2000—months after the allegedly discriminatory acts by the Department. The four non-transfers to the Vice Unit were in 1996, 1997, and 1999; and her suspension for insubordination was in 1999. Her shoulder injury in 2000 would not have affected her ability in earlier years to perform the requirements of the jobs that she sought. Therefore the district court mistakenly ruled that her shoulder injury could be a proper ground for summary judgment on this claim.

The district court also stated that she failed to establish the fourth prong of a prima facie case because she did not identify a similarly situated male officer who was treated differently than she was. A similarly situated employee is directly comparable in all material respects. *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir.2002). Ptasnik must show not only that the employees reported to the same supervisor, engaged in the same conduct, and had similar qualifications, but also that there were no "differentiating or mitigating circumstances as would distinguish ... the employer's treatment of them." *Radue v. Kimberly–Clark Corp.,* 219 F.3d 612, 617–18 (7th Cir.2000); *see also Peele v. Country Mut. Ins. Co.,* 288 F.3d 319, 330 (7th Cir.2002).

Ptasnik disagrees with the district court's finding because she did identify four employees who, she asserts, are similarly situated. The first three employees—Officers Moore, Patterson, and Mitchell—were transferred from the Vice Unit to another Unit after having served only a year in Vice. But these officers are not similarly situated to Ptasnik because they were originally in the Vice Unit—the unit to which she wanted to transfer—and not in her current unit (the Street Crimes Unit). She has failed to show how their jobs were so similar to her own that they were similarly situated in terms of reporting to the same supervisor, having the same job description, or engaging in similar conduct. In any case, these three officers are not similarly situated because according to the record, they were transferred precisely because of an

unspecified conflict with their supervisor; Ptasnik's situation was not subject to any such circumstances.

The fourth employee who Ptasnik identifies presents a closer case, though the district court found that he too was not similarly situated to Ptasnik. Chad Batterham served in the Street Crimes Unit at the time of the interview for transfer and was chosen for the Vice Unit over Ptasnik in March 1999. He was hired on the same day as Ptasnik, and granted a transfer, even though he had served only one year in the Street Crimes Unit. Batterham's length of service, job experience, and job description were comparable to Ptasnik's. However, Batterham had not been tagged by the Department as having the sort of behavioral problems that followed Ptasnik.

■ Although not addressed by the district court, Ptasnik's failure to show that the employment action was adverse is pressed by the Department as the principal reason why the court's judgment should be affirmed. The Department maintains that the transfer would not have involved any change in financial terms, and would not constitute a promotion since any transfer would have been from one special unit to another special unit. Nevertheless, Ptasnik asserts that because officers in the Vice Unit perform higher level police work than the Street Crimes Unit, denial of the transfer prevented her advancement within the Department.

A transfer or denial of transfer can be adverse even where there is no change in financial terms, if it "significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced so that the skills are likely to atrophy and his career is likely to be stunted." *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744 (7th Cir.2002). At the very least, the ac-

tion must involve "more than a minor change in working conditions." *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir.1996). In order to establish an adverse employment action, Ptasnik must establish that the transfer she was denied would have been more favorable in some material respect, than her present job.

Ptasnik has not pointed to any evidence to support a finding that there is a difference in status or responsibility between the two units that constitutes more than a minor change in working conditions. The parties do not dispute that in the Vice Unit, the focus is not on the number of arrests on the street, as in the Street Crimes Unit, but rather on building cases against suppliers of drugs, and testifying in court. However, Ptasnik presents no evidence for her contention that transfer to the Vice Unit would provide opportunities for advancement within the ranks. Ptasnik cannot show that the denial of her transfer constituted an adverse employment action.

Ptasnik has failed to establish a prima facie case of disparate treatment, but even if she had established such a case, it would fail on pretext. The Department granted Batterham's transfer because, according to an officer who sat in on the interview, he demonstrated a more thoughtful, innovative, and dynamic approach to the interview questions. Ptasnik has not pointed to any evidence that would call into question the honesty of the Department's reasons for not transferring her. *Kulumani v. Blue Cross Blue Shield Ass'n,* 224 F.3d 681, 685 (7th Cir.2000).

■ Ptasnik argues that the district court erred in concluding that her evidence of being subjected to foul language, rumors, and sexual comments was not sufficiently severe or pervasive to establish a

hostile work environment. Ptasnik asserts that the foul language she experienced was pervasive, the rumors ongoing, and the sexual comments directed at her and other women were offensive.

To establish a hostile work environment, Ptasnik must show that the level of hostility she endured was "hellish." *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir.2003) (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428 (7th Cir.1994)). In evaluating hostile work environment claims, courts examine the 1) frequency, 2) severity, 3) humiliating, threatening, or merely offensive nature of the conduct, and 4) whether it interferes with the employee's work performance. *Russell v. Board of Trustees of the Univ. of Ill. at Chicago*, 243 F.3d 336, 343 (7th Cir.2001). Merely unpleasant or boorish behavior is not prohibited by the law. *Russell* 243 F.3d at 343–44.

The district court's analysis of Ptasnik's hostile work environment claim is troubling. The court found that because Ptasnik herself admitted that she often used the word "fuck," she could not create a factual dispute about whether she was offended by her coworker's vulgar language. But this court has rejected such reasoning; in *Carr v. Allison Gas Turbine Div.*, 32 F.3d 1007, 1011 (7th Cir.1994), this court held that a plaintiff's conduct is relevant only if she manifested "enthusiastic receptiveness to sexually suggestive jokes and activities," indicating that the conduct was welcome. *Id.* at 1011 (quoting *Reed v. Shepard*, 939 F.2d 484, 486–7 (7th Cir. 1991)). Ptasnik's complaints to the EEO representative and to her supervisors indicate that the behavior at issue was not welcome. In any event, the foul language Ptasnik complains of does not support a hostile work environment claim because it was directed at other women in police custody, not at Ptasnik. *See, e.g., Russell,*

243 F.3d at 343; *see also Hildebrandt v. Ill. Dep't of Natural Res.,* 347 F.3d 1014, 1035 (7th Cir.2003).

The false rumors do not bolster her claim either, because it is not clear that these rumors were spread about Ptasnik *because of* her sex. A plaintiff must show that she was "exposed to disadvantageous terms or conditions of employment to which members of the other sex were not exposed." *Haugerud v. Amery Sch. Dist.,* 259 F.3d 678, 692 (7th Cir.2001) (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). Ptasnik testified that jokes about marital "infidelities" were commonly directed to both male and female officers. At least one of the rumors Ptasnik complains of was also distressing to Councilman Nichting, the male subject of the rumor. Because both male and female officers were the subject of sexual rumors, these rumors were likely spread for reasons having "nothing to do with gender discrimination." *Pasqua v. Metropolitain Life Ins. Co.,* 101 F.3d 514 (7th Cir.1996).

The remaining comment on which Plaintiff bases her hostile work environment claim—the statement directed to Ptasnik by Captain Button that she looked so good he "could fuck her"—simply does not, on its own, rise to the level of offensiveness required by this circuit to create a hellish environment. See *Rogers v. City of Chicago*, 320 F.3d 748, 750 (7th Cir.2003) (environment not hellish where Rogers' supervisor told her that he'd like to be in her back pocket, her breasts looked nice in the turtleneck she was wearing, and asked her to walk across the room and put a paper in a tray so he could "watch her put it in"). This comment, as objectionable as it was, was insufficiently offensive to be considered hellish.

Ptasnik finally argues that the district court erred in denying her retaliation claim because she satisfied her prima facie case, and had evidence that the reason for the adverse action was a pretext. She argues that the fact that she was placed on administrative leave and yelled at by Chief Stenson "about the lawsuit" on the day her administrative leave was granted, indicate that she was a victim of retaliation.

Title VII prohibits employers from retaliating against employees who contest allegedly discriminatory acts. *See* 42 U.S.C. § 2000e–3(a); *see also Fine v. Ryan Int'l. Airlines*, 305 F.3d 746, 751 (7th Cir.2002). A prima facie case of retaliation is established under the adapted *McDonnell Douglas* method of proof, when an employee shows that after filing a discrimination complaint, "only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir.2002).

Ptasnik fails to establish a prima facie case of retaliation because she fails to show that she was performing the job in a satisfactory manner. At the time the Department put her on administrative leave, she was unable to fire a gun, which was a requirement of her position.

Even if she had established a prima facie case, the Department had a legitimate non-discriminatory reason for its action: Ptasnik was put on administrative leave as a result of her own request for leave because she was suffering from stress which prevented her from doing her job. Ptasnik does not challenge the Department's reason for putting her on leave; she makes only a vague assertion that Stenson yelled at her "about the lawsuit" on the day her leave was granted, and this argument does nothing to show that the reason she was put on leave was a phony one.

The district court's opinion is affirmed.