# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-1256

TRAVIS WILLIAMS,

*Plaintiff-Appellant,*

v.

WASTE MANAGEMENT OF ILLINOIS, INCORPORATED
d/b/a Waste Management of Springfield,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 02 C 3023—**Jeanne E. Scott**, *Judge.*

———————

ARGUED OCTOBER 23, 2003—DECIDED MARCH 24, 2004

———————

Before MANION, KANNE, and EVANS, *Circuit Judges.*

KANNE, *Circuit Judge.* Travis Williams sued his former
employer, Waste Management of Illinois, Inc. d/b/a Waste
Management of Springfield, for race-based harassment,
discrimination, and retaliation in violation of Title VII of
the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.,*
and 42 U.S.C. § 1981. The district court granted Waste
Management's summary-judgment motion, and we affirm.

## I. Background

Waste Management hired Williams, an African American, as a laborer on June 12, 2000. Williams worked at Waste Management's Springfield, Illinois location, which housed two facilities—a machine shop (which was part of the company's hauling operation) and a transfer station. The machine shop performed repairs and maintenance on trucks and other equipment, and the transfer station collected trash from trucks then routed the trash to other trucks for hauling to a landfill located in Taylorville, Illinois. The Taylorville landfill was another Waste Management operation. Offices located at the Springfield site were connected to the machine shop by a common employee break room. The employee bulletin board was located in the break room, and the postings included the company's human relations hotline telephone number.

While most employees at the Springfield site were assigned to either the hauling operation or the transfer station, Williams was assigned to both. His primary responsibilities involved grooming the machine shop's and transfer station's shared grounds using a lawnmower and weed eater. He would also pick up trash blown off the trucks, direct truck traffic, and fill in for transfer-station employees on heavy equipment as needed.

Williams was interviewed and hired by Roy Whittinghill, who was Caucasian, and Antonio Curren, who was African American. They served as his co-supervisors after hire. Whittinghill was the district manager for the Springfield transfer station, the Pana transfer station, and the landfill in Taylorville, and divided his time among these operations. Thus, he was not always on site to direct Williams and observe his work. Curren, in contrast, was a district manager for the hauling operation, worked full time at the Springfield facility, and was always available to Williams. Williams testified that he could find Curren when he

needed him, that he saw him daily, and that he was approachable. Williams said he felt the same about Whittinghill—that he was approachable and someone he could talk to.

About a month into his employment, Williams left work early after exposure to poison ivy resulted in a rash. Curren gave him permission to leave on the condition that he bring back a doctor's note. Williams did not comply with Curren's direction because he couldn't afford a doctor's visit. When he reported for work the following day without a note, Curren sent him home. Williams didn't return, and the company terminated him pursuant to its policy after he was a no call, no show for three days.

Whittinghill telephoned Williams after his termination to inquire why he had abandoned his job. Whittinghill rehired Williams after he explained he felt he wasn't allowed to return unless he could produce a note, and he couldn't produce a note because of the expense.

Curren agreed to Williams's return, but only if Whittinghill took full management responsibility of Williams. Curren felt Williams was a poor employee— specifically, that he worked too slowly and had attendance issues. Williams, it appears, was unaware of the shift in supervisory roles and continued to seek help and direction from Curren. Curren, for his part, continued to make himself available to Williams and to direct his work when Whittinghill was off site.

Although Williams got on well with his supervisors, he believes he was harassed by his coworkers due to his race. Specifically, two Caucasian mechanics named Eddie Cleeton and Virgil Beckum were named by Williams. Cleeton and Beckum worked for the hauling company in the machine shop where Williams's lawn equipment and supplies were stored. Their job responsibilities included making repairs to Williams's lawn equipment as needed. Their immediate supervisor was Mark Baccadutre, who was also Caucasian.

On Williams's first day at work, he took his morning break with Cleeton and Beckum in the shop. Although the designated employee break room was connected to the shop, the two mechanics tended to take their breaks in the shop itself around a radio, often along with another Caucasian employee, Lee Webster, and sometimes supervisor Curren. After the break, Beckum sang songs that Williams didn't like, which prompted him to ask Beckum if he was prejudiced. Beckum said he was, making a gesture with his hand to show how much, and asked Williams how he was with "Black" jokes. Williams told Beckum that he wouldn't tolerate them and would appreciate it if he didn't tell them in his presence. Beckum shrugged his shoulders, said "hmmmmm," and walked away. According to Williams, although other employees were working in the area, he doesn't know whether they heard the exchange.

That same morning, after break, Cleeton told Williams that he looked like the gorilla that worked at Chuck E. Cheese, then said something about a monkey, which Williams took to be a racist joke. Williams then told Cleeton, like he did Beckum, that he wouldn't tolerate such jokes and asked Cleeton to keep racist comments to himself. Cleeton laughed and walked away. According to Williams, the only witness was a female truck driver named Becky who worked for another company.

Williams did not report these incidents to anyone at that time, feeling that he had had a chance to tell Beckum and Cleeton how he felt about their behavior, that they had listened to him, and that hopefully it was resolved. He had received a copy of Waste Management's employee handbook and knew it contained a policy prohibiting harassment. He knew that if he had a problem with harassment he could go to any supervisor to complain. Williams continued to take his breaks in the shop with the mechanics, rather than in the employee break room or in the transfer station where other employees took their breaks.

A couple of days later, Williams overheard Webster say "nigger" and "radio" as he was talking to Beckum. There was a truck separating Williams from Webster and Beckum, and they couldn't see him. Williams believes that Webster was accusing him of changing the station on the radio they all listened to during break. However, he didn't let Webster or Beckum know he overheard them and didn't complain about the racial slur to anyone at the time.

The next incident occurred about a month later, in July, around the time he contracted the poison ivy rash. The old weed eater Williams used quit working. The next morning he found a wooden sickle with an extension cord taped to it on his workbench. According to Williams, the extension cord had been fashioned into a hangman's noose. Cleeton and Beckum laughingly asked him how he liked his new weed eater. Williams believed that Baccadutre, the mechanics' supervisor, saw the noose, but does not name any other witnesses and does not remember what else may have been said.[1] Williams did not report the incident to management.

A few days after the noose incident, Beckum "goosed" Williams by poking him with a broom handle in the rear end when he bent over to do some work. Beckum laughed

---

[1] According to Nelson Hundley, a May Trucking driver who later testified to being present, Beckum was holding a green plastic weed eater with a noose on it and said, "What's this remind you of, nigger?" Williams then responded by yelling, "You're a racist son of a bitch!" Hundley stated that the weed eater with the noose remained propped up against the wall for two to three days and that both Baccadutre and a supervisor, whom he believed was Whittinghill, saw it. The record isn't clear as to when Williams became aware of Hundley as a witness, although it appears it was not until after Williams left Waste Management. Further, there's no evidence that management learned Hundley was a witness or heard his version of events until after Williams filed his administrative charge.

and said to Cleeton, "Look how Travis jumped when I goosed him with the broom." Cleeton laughed. Williams did not complain.

Sometime in July, after all of the above incidents occurred, but close in time to the noose and broom incident, Whittinghill approached Williams and asked if any of the guys in the machine shop were hassling him in terms of racial comments or slurs. Williams states that he lied and said that everything was fine and that no one was messing with him.

On July 17, 2000, Whittinghill approached Williams again and said, "Travis, you would tell me if these guys are being racial towards you? You know, you're a good guy, and we want to keep you working here. You would tell me?" Prompted by this second inquiry, Williams told Whittinghill about all of the incidents described above and that he believed Beckum and Cleeton were racist. Whittinghill laughed a little bit at the description of the broom incident, which made Williams believe he was treating his complaint as less than serious. Williams also felt Whittinghill smirked at the majority of the incidents, as if they were a joke. After listening to what he had to say, though, Whittinghill told Williams that Cleeton and Beckum were "different" and that he was going to talk to their boss, Baccadutre, about how they were behaving. He also said he was going to tell his boss about Williams's complaint.

The next day, Whittinghill told Williams to take his breaks in the transfer station—the other facility to which he was assigned and where some other employees took their breaks—rather than in the shop with Cleeton and Beckum and to generally try and avoid them. According to Williams, although Whittinghill didn't tell him that his complaint had been investigated, he could tell by their behavior that Cleeton and Beckum had been "chewed out" by somebody. They told him by the ice machine in the shop that it was a

shame he was "making trouble" by complaining about their behavior and that they didn't want anything to do with him. Williams did not report the comment, which he considered retaliatory. Williams had no other problems with racially harassing behavior after he complained.

As for Waste Management's handling of Williams's complaint, the undisputed record shows that immediately after receiving the complaint, Whittinghill drove to the Taylorville site where Baccadutre was working that day. He met with Baccadutre in his office and relayed the details of Williams's complaint. Upon learning of the allegations, Baccadutre immediately left the Taylorville site and drove to the Springfield facility to investigate. He called Cleeton and Beckum into a meeting with him. He confronted them with the details of the complaint as they had been relayed by Whittinghill. Cleeton and Beckum denied the allegations. Baccadutre then told them that the alleged behavior would not be tolerated by him or Waste Management and that he would investigate further. He warned them that if he found any truth to the complaint they would be fired.

According to Baccadutre, Whittinghill told him that Williams said there were no witnesses to the incidents. Baccadutre, therefore, did not conduct any further interviews and concluded that without witnesses he could not come to a conclusion about the truth of the allegations. Baccadutre did not contemporaneously document his interview with Cleeton and Beckum, his verbal warning to them, or his resolution of the matter. Nothing was placed in the mechanics' personnel files. Whittinghill similarly did not contemporaneously document his conversation with Williams, and there is no evidence that he or Baccadutre reported the complaint up the chain of command or to Curren. Baccadutre did report his findings and actions to Whittinghill and told him that he would not tolerate any harassment, verbal or physical, by his mechanics. Baccadutre also suggested that since there may be a per-

sonality conflict between the mechanics and Williams that Williams take his breaks elsewhere than in the shop where the mechanics worked. Whittinghill then followed up with Williams as described above.

Following his complaint, Williams believes he experienced additional retaliatory behavior from the mechanics based on the following incidents. First, Cleeton asked Williams for help changing a tire on an eighteen-wheel truck. Although Williams expressed that he didn't know how to change a tire on an eighteen-wheeler, Cleeton told him that he just needed to hold a large wrench (three or four feet long) on the bolt on the other side of the tire while he used a compressed air wrench on the opposite side to loosen the nut. When Cleeton started the air wrench on the opposite side, the force yanked the wrench out of Williams's hand. The wrench flew up into the air, flipped a couple of times, and landed on Williams's head, resulting in a small cut and a knot. Cleeton laughed. Williams believed Cleeton set him up for injury, because a week or so earlier Cleeton told him he hit a Caucasian employee named Ron with a wrench and that he'd do it to Ron again. Beckum, however, testified that the same thing had happened to him when he failed to get a tight grip on the wrench. Williams never reported the incident to anyone.

The second and third allegedly retaliatory incidents occurred on Williams's last day of work, August 31, 2000. That morning, Curren directed Williams to cut the front lawn because it was getting long. Williams replied that he couldn't because the riding mower was down, and the mechanics had not yet fixed it. Curren said he'd go to the shop right then and tell Beckum to fix the mower immediately so Williams could cut the lawn that day. According to Williams, Beckum did as directed, dropping another project in order to do so. When Williams picked up the mower, Beckum was "all smiles" and "real nice," telling Williams to get on the mower and go cut the grass. Williams was

suspicious. He inspected the mower and found that the bolt holding the blade was loose, almost to the point of falling off. Williams showed Curren. He did not tell Curren that he believed Beckum deliberately sabotaged the machine. Curren "chewed" out Beckum for his sloppy repair job and for creating a safety hazard and made him fix the mower correctly. Beckum stated that he'd forgotten to tighten the bolt. Williams then mowed the lawn without incident. According to Williams, he felt management was supportive of him in response to his complaint about the mower and that Beckum was mad because management took Williams's side.

Later that morning, Williams was cutting weeds under a wood fence with a new weed eater. While working, he would hit the fence with the weed eater blades from time to time, resulting in a loud vibration. When he brought the weed eater into the shop to refuel it, Beckum asked Williams if he was going to shorten up the fence with the new weed eater. Williams told Beckum to let him do his job. The two argued, culminating with Beckum yelling at Williams to "get the fuck out of my shop!" Williams, who states he was "fed up," went to Curren's office and told him that he was going to "whoop [Beckum's] ass" if he didn't speak to him with more respect. Curren said that he would contact Beckum's supervisor, Baccadutre, and see if he could come to the site so the issue could be addressed. Williams then took an early lunch.

Curren called Whittinghill, who was off site, to let him know there was a problem and to come immediately to Springfield for a meeting. Whittinghill responded that he could not because he was covering for another employee at the Pana transfer station who was on vacation. Curren next called Baccadutre, who immediately drove in from Taylorville. The two supervisors, Curren and Baccadutre, called Beckum and Williams into a meeting in Curren's office after lunch to investigate the conflict. Baccadutre explained that he wanted everyone to act like adults and if

they couldn't do that he would send them both home. He then gave both men a chance to tell their sides of the story. Beckum apparently stated that he did not use profanity when addressing Williams, and Williams called him a liar and repeated what Beckum had said. According to Williams, Baccadutre took his side and told Beckum: "Travis works here, and he needs equipment from out of that shop. You have no jurisdiction telling this man to get out of that shop, and if I find out that you told him that, I'm going to write you up." Baccadutre also reminded Beckum that he had been previously written up for speaking badly to the company's sales manager.

After both men told their differing stories, the supervisors said that they couldn't come to a conclusion as to whom was telling the truth since there were no witnesses. They warned that if the arguing persisted both would be written up, and they made them shake hands. Williams stated that he also apologized to Beckum because it was a hundred degrees outside, and it was natural for tempers to flare. Beckum apologized in return. The supervisors asked Williams if the meeting resolved his concerns. Williams said he responded, "[A]s long as [Beckum] talks to me like he's got respect for me and he doesn't curse at me, I think everything will go smooth." At no time did Williams inform either supervisor that he felt Beckum's behavior was racially motivated or in retaliation for Williams's complaint about racial harassment six weeks earlier.[2]

Despite expressing satisfaction with how management handled his complaints on August 31, 2000, Williams decided not to return to Waste Management. He stated that

---

[2] In support of his summary-judgment motion, Williams presented testimony from Hundley that after Williams abandoned his job, Cleeton told Hundley "we got rid of your little nigger friend." Again, there is no evidence that Hundley, Williams, or anyone else reported this exchange to management or that management was aware of it.

he refused to return to work because he felt he didn't get anywhere with the confrontation with Beckum because he didn't have a witness, and thus the supervisors considered the problem mutual. He said the other bigger reason he didn't return was because Beckum threatened his life through the loose mower blade incident. He alleges that his unsafe work environment resulted in his constructive discharge. Williams did not discuss his decision to quit with Whittinghill or Curren; he simply stopped showing up for work. Waste Management terminated his employment after he was a no call, no show for three days.[3]

Williams jointly filed a charge of discrimination with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission. After exhausting his administrative remedies, he filed suit in federal district court. That case was resolved by summary judgment in favor of Waste Management, leading to the present appeal by Williams.

## II.  Analysis

We review a district court's grant of summary judgment de novo, construing all facts and inferences in the light most favorable to the non-moving party, Williams. *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[3]  It is undisputed that Waste Management planned to terminate Williams shortly before the end of his ninety-day probationary period due to attendance issues and poor work performance. Waste Management did not have the opportunity to terminate Williams for unsatisfactory work performance, though, due to his intervening job abandonment, and its records reflect that he was terminated for his three-day absence from work without notice. There is no evidence in the record indicating that Williams was aware of his impending termination.

242, 255 (1986). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Tutman*, 209 F.3d at 1048 (quoting Fed. R. Civ. P. 56); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Williams makes identical claims for race-based harassment, discrimination, and retaliation under Title VII and 42 U.S.C. § 1981. Since Section 1981 claims are evaluated under the same rubric as Title VII claims, *Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 637 n.1 (7th Cir. 2001), we will not address them separately.

### A. Racial Harassment

Williams alleges that his coworkers, Cleeton and Beckum, created a hostile work environment through their race-based words and actions, in violation of Title VII. To survive a summary-judgment motion, an employee alleging racial harassment must show: (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability. *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000) (citing *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998)). After the Supreme Court's decisions in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), we evaluate the fourth prong regarding the basis for employer liability differently depending on whether the alleged harassment was perpetrated by supervisors or coworkers. Employers are strictly liable for harassment inflicted

by supervisors, subject to an affirmative defense when the harassment does not result in a tangible employment action. *See Mason*, 233 F.3d at 1043 (citing *Ellerth*, 524 U.S. at 765 and *Faragher*, 524 U.S. at 807-08). When a plaintiff, like Williams, claims coworkers alone were responsible for creating a hostile work environment, he must show that his employer has "been negligent either in discovering or remedying the harassment." *Mason*, 233 F.3d at 1043 (quoting *Parkins*, 163 F.3d at 1032). Put differently, "the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Tutman*, 209 F.3d at 1048.

The district court made no findings as to the first three elements of Williams's hostile environment claim, focusing instead on the company's response to his complaint. It found, as do we, that Waste Management took prompt, appropriate corrective action when informed of Williams's complaint, relieving it from liability under the statute.

First, Waste Management was not negligent in discovering that Williams may have been subjected to a racially harassing work environment. Williams knew that Waste Management had a policy prohibiting harassment in the workplace and that the appropriate step to take if he felt he was targeted because of his race was to approach any supervisor with his concern. Despite his admittedly good relationship with both of his supervisors, he did not tell either of them about Beckum's and Cleeton's comments his first day at work, Webster's racial slur shortly thereafter, or the noose or broom incidents that occurred approximately a month later. Instead, Whittinghill had to approach Williams twice before he admitted experiencing the above. Whittinghill's concern over Williams's work environment coincided with the noose incident—the only incident Williams testified a supervisor, Baccadutre, may have seen.

Second, once Whittinghill was aware of Williams's complaint, he, in conjunction with the mechanics' supervisor, Baccadutre, took prompt action that included effective remedial measures calculated to end the harassment. Immediately after hearing Williams's complaint, Whittinghill drove to the Taylorville site and reported the problem to Baccadutre. Baccadutre then immediately drove back to Springfield and called Beckum and Cleeton into a meeting. Even though they denied the allegations, Baccadutre delivered a verbal warning threatening termination if they were found lying and reiterated that neither he nor the company would tolerate harassment. Baccadutre reported his findings to Whittinghill, including the suggestion that Williams take his breaks elsewhere than in the shop where the mechanics worked. He also reaffirmed to Whittinghill that he would not tolerate future harassing behavior from his employees. Whittinghill reported back to Williams the next day, albeit only to tell him to take his breaks in the transfer station and to generally avoid the mechanics. The net result was that Williams's complaint was dealt with within twenty-four hours, and he experienced no further race-based harassment.

Williams argues that making him take his breaks in the transfer station was an inappropriate remedial measure because it was a "less desirable" break location and because he had to change his routine and the alleged harassers didn't. Although we agree that if changing Williams's break location materially disadvantaged him, it would not have been an appropriate remedial measure, *see Tutman*, 209 F.3d at 1049 (noting that remedial action that makes a victim worse off is ineffective *per se*), there is no evidence that is the case here. Williams fails to convincingly articulate why breaking in the transfer station was "less desirable" than in the shop—especially considering he was assigned to the transfer station and other employees took their breaks there as well. Moreover, considering it was management's goal to separate the parties, which we have

found to be an appropriate remedy in race harassment cases, *see*, *e.g.*, *id*, it made more business sense to direct Williams to take his breaks elsewhere. The mechanics worked out of the shop full time, whereas Williams worked the majority of the time outdoors and was assigned to both the shop and the transfer station. Compared to the employee break room, which was connected to the shop and which anyone could use, Williams was less likely to cross paths with the mechanics in the transfer station.

Williams also makes much of the fact that Whittinghill and Baccadutre failed to follow Waste Management's written statements contained in its "Core Values of Ethical Conduct" publication and in a training acknowledgment form, both describing aspects of conducting a workplace harassment investigation. Specifically, Williams points to the managers' failure to take contemporaneous notes of the interviews conducted or to report the incident to upper management, human resources, or the legal department. He also criticizes Baccadutre for his failure to speak with Williams personally about his complaint, instead relying on Whittinghill's recitation, for interviewing Beckum and Cleeton together instead of individually, for failing to conduct additional interviews of other Waste Management staff in an attempt to find corroboration of Williams's complaint, for not documenting the complaint in the mechanics' personnel files, and for not instituting a harsher punishment than the verbal warning, among other failures. Williams alleges that all of these shortfalls create an issue of fact as to whether Waste Management responded negligently to his complaint, creating a triable issue for the jury.

While we observe that the investigation was by no means textbook in its execution, we cannot ignore (nor could a jury ignore) the undisputed facts that both Whittinghill and Baccadutre took prompt action in response to Williams's complaint and that Baccadutre's stern verbal warning to

the mechanics, plus Whittinghill's direction to Williams to take his breaks elsewhere, had both the purpose and effect of eliminating further race-based harassment. Although the process may have been imperfect, it was not negligent. *See Berry v. Delta Airlines*, 260 F.3d 803, 811 (7th Cir. 2001) ("If an employer takes reasonable steps to discover and rectify the harassment of its employees . . . it has discharged its legal duty.' ") (quoting *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996)).

We note that this case is similar to *Berry v. Delta Airlines*, *supra*, another hostile work environment case in which we also affirmed the district court's grant of summary judgment. There, the plaintiff complained of a sexually hostile work environment caused by a non-supervisor who had subjected her to both verbal and physical harassment over an eight-month period. Upon hearing her complaint, the supervisor said "boys will be boys," but undisputedly immediately investigated her claims. *Id.* at 805. Although the supervisor could not confirm her allegations, all employees were directed to watch a sexual harassment video. The alleged harasser was also asked to, and did, move to a different shift, although he was never reprimanded for his alleged improprieties, never told to keep away from the victim, and never told that the reason for the requested shift change was to eliminate most contact with the victim (their shifts continued to overlap an hour-and-a-half each day). *Id.* at 805-06.

In affirming the district court's grant of summary judgment on the hostile work environment claim, we determined that the employer acted promptly and appropriately to end the harassment. Although we acknowledged that the employer could have done more, we found that irrelevant unless the plaintiff presented some evidence suggesting that the steps her employer took were not reasonably likely to prevent the harassment from recurring, which she did not do. *Id.* at 813.

Because Waste Management was not negligent in un-covering, then responding, to Williams's complaint and no jury could find otherwise based on the undisputed facts, the district court properly granted summary judgment to the company on Williams's hostile environment claim.

## B. Retaliation

Williams also alleges that Beckum and Cleeton retaliated against him for complaining about their behavior. In *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640 (7th Cir.), *cert. denied*, 537 U.S. 879 (2002), this circuit modified its approach to retaliation claims under Title VII and clarified the proof necessary to survive summary judgment. As we subsequently summarized in *Sitar v. Indiana Department of Transportation*, 344 F.3d 720 (7th Cir. 2003):

> The plaintiff may establish a prima facie case of re-taliation and overcome defendant's motion for summary judgment using either the direct method or the indirect method. Under the direct method, the plaintiff must present direct evidence of (1) a statutorily protected activity; (2) an *adverse employment action* taken by the employer; and (3) a causal connection between the two.
>
> Under the indirect method, the plaintiff must show that (1) she engaged in a statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite her satisfactory job performance, she suffered an *adverse action from the employer*; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.

*Id.* at 728 (citing *Stone*, 281 F.3d at 644) (emphasis added). Generally required under both analyses is that the plaintiff

suffered an adverse employment action.[4] We find, as did the district court judge, that Williams did not suffer an adverse employment action, entitling Waste Management to summary judgment on his retaliation claim under either the direct or indirect approach.

Williams alleges that the actions of Cleeton and Beckum, and to a lesser extent, management, resulted in his constructive discharge, which, if true, would amount to an adverse employment action. *EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002) ("Constructive discharge, like actual discharge, is a materially adverse employment action."). Constructive discharge occurs when an employee's job becomes so unbearable that a reasonable person in that employee's position would be forced to quit. *Id.*; *see also Tutman*, 209 F.3d at 1050. Facts proving constructive discharge as an adverse employment action supporting a retaliation claim can consist of coworkers or supervisors being just plain mean (for example, subjecting an employee to a humiliating, degrading, unsafe, unhealthful or otherwise significantly negative workplace environment not present before the complaint) or further race-based harassing acts following the complaint. *See Herrnreiter*, 315 F.3d at 744-45; *Univ. of Chicago Hosps.*, 276 F.3d at 331-32 (noting that while constructive discharge usually results because of continued discriminatory harassment, it can also be demonstrated by other means, includ-

---

[4] We observed in *Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742 (7th Cir. 2002), *cert. denied*, ___ U.S. ___, 124 S.Ct. 472 (2003) decided after *Stone*, *supra*, that retaliation claims need not always involve an adverse action directly related to *employment*, just an adverse action by an employer of some kind, depending on the facts. *Id.* at 745 (citing cases). However, as Williams has alleged only adverse action related to his employment in support of his retaliation claim, we evaluate his evidence in terms of whether it amounts to an adverse *employment* action.

ing blatant cues that the employee is no longer wanted and will be fired if the employee doesn't resign first). Regardless of the facts used to illustrate the condition of the employee's work environment, the circumstances must be such that a reasonable person put in the same situation would find it to be intolerable. *See* 276 F.3d at 331; *Tutman*, 209 F.3d at 1050.

Williams appears to posit two theories for why he felt compelled to resign. First, he alleges events occurring after his July complaint were race-based and thus a continuation of the harassment he believes he experienced. Second, he contends that the post-complaint events were threats to his physical well-being calculated to make him quit.

Williams's first argument that events following his July complaint were continued harassment because of his race has no support in the record. To review, he alleges that the following events occurred: (1) Cleeton and Beckum said it was too bad he was stirring up trouble and that they don't want anything to do with him; (2) Cleeton asked for his assistance with changing a truck tire, and Williams was hit on the head by a wrench in the course of it; (3) during mower repair Beckum deliberately failed to tighten the bolt that secured the mower blade; (4) Beckum made a smart remark about Williams's operation of the weed eater and swore at him; and (5) management, although they took Williams's side regarding the mower blade repair and weed-eater altercation, failed to determine conclusively that Beckum was at fault.

As an initial matter, Williams, in his deposition testimony, never characterized the above events as being related to his race or as a continuation of the harassment he says he previously experienced. He relates the incidents only to Cleeton and Beckum being mad about his complaint.

Next, an examination of the events as Williams tells them reveals no race-based component supporting the theory that

they represent an ongoing campaign of racial harassment. The first incident barely deserves mention, as the mechanics' alleged statements about stirring up trouble and not wanting anything to do with him can clearly be understood as referring to Williams's complaint—which is, indeed, how Williams himself interpreted it. As to the second incident, the record reveals, unfortunately, that getting hit with a large wrench while changing a truck tire was not an isolated event and one that white employees also experienced, including "Ron," who Williams also believes Cleeton set up for injury. Next, Williams's experiences with Beckum on his last day of work are conspicuously devoid of any cues that they were motivated by Williams's race. Finally, Williams has never alleged his supervisors were racially biased and nothing in their resolution of the conflict between Beckum and Williams on his last day of work indicates that they were.

Our decision in *Berry, supra*, is once again instructive on the issue of whether the post-complaint events should be considered part of a continuing campaign of race-based harassment. In *Berry*, after the plaintiff complained about the sexually harassing conduct, the alleged harasser sarcastically teased her about being the reason he had to watch the sexual harassment video. He and other employees were rude and uncooperative, making it difficult for her to do her job, driving her to tears. However, she admitted that the sexually charged harassment stopped. 260 F.3d at 807. We found that the actions taken by the alleged harasser and his coworkers after the plaintiff complained were not representative of an ongoing campaign of sexual harassment. This was due to plaintiff's admissions that all sexual harassment ceased after she complained and due to the lack of evidence that the subsequent behavior was

gender-based, rather than based on some other basis, such as her complaint. *Id.* at 809.[5]

Based on all of the above, we reject Williams's contention that continued racial harassment forced him to abandon his position at Waste Management.

We now turn to Williams's alternative position that fear for his safety and, to a lesser extent, management's approach to that concern resulted in his forced resignation. This claim is significantly undermined by evidence that Williams either never told management about the incidents (the mechanics' comments about stirring up trouble and getting hit with the wrench) or, if he did report them, never indicated he felt they were motivated by his complaint six weeks earlier. Instead, Williams expressed satisfaction with how management took his side in the two incidents he did report (the mower bolt and Beckum's disrespect that same day). He shook hands with and accepted an apology from his alleged tormentor, Beckum, and told his supervisors, when pressed about whether he believed the conflict was resolved, "[A]s long as he talks to me like he's got respect for me and he doesn't curse at me, I think everything will go smooth." He then stopped showing up for work without notice or explanation.

Based on these facts, Williams simply did not demonstrate that his work environment was so intolerable that a reasonable person in his position would resign. Although we are sympathetic to Williams's concerns that Cleeton and Beckum, a puerile and mean-spirited pair, had the will and means to physically harm him, Williams did not give management—by his own account, approachable, support-

---

[5] Because the plaintiff did not make a retaliation claim in her complaint, we did not go on to decide whether the behavior that occurred after she lodged her complaint was due to her complaint, and thus a violation of Title VII's anti-retaliation provisions.

ive and responsive—fair notice of his fears or an opportunity to address them. We have repeatedly stated, when examining constructive discharge allegedly caused by a hostile environment, that "[w]orking conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because in the ordinary case an employee is expected to remain employed while seeking redress." *Tutman*, 209 F.3d at 1050 (citing *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998)); *see also Robinson v. Sappington*, 351 F.3d 317, 336 (7th Cir. 2003) (listing cases). Williams's case is not one in which the work environment was so extraordinary that he had no duty to remain employed while allowing management to address his concerns. Because he was not constructively discharged, he did not suffer an adverse employment action, and his retaliation claim fails.

## C. Race Discrimination

Williams makes a poorly developed claim that he suffered from race discrimination while employed at Waste Management because Baccadutre handled his harassment complaint involving Beckum differently from sex harassment allegations lodged against Beckum by a white female. In that circumstance, Waste Management became aware of a female employee's complaint against Beckum made outside of work involving conduct occurring outside of work after their relationship soured. In response to learning of that complaint, Baccadutre wrote a memorandum to Beckum informing him that Waste Management would not tolerate sexual harassment at work. Baccadutre did not consider it discipline, but did expect that it was going in Beckum's personnel file.

Race discrimination claims can be proved by presenting evidence directly showing an employer's discriminatory

intent or by showing disparate treatment using indirect evidence and the burden-shifting method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Alexander v. Wis. Dep't of Health and Family Servs.*, 263 F.3d 673, 682 (7th Cir. 2001). Based on the limited facts provided by Williams supporting his claim, he has not directly proven that Waste Management intended to discriminate against him based on his race in handling his complaint against his coworkers. To survive summary judgment under the burden-shifting method, then, Williams must first establish a prima facie case consisting of the following elements: "1) he belongs to a protected class; 2) his performance met his employer's legitimate expectations; 3) he suffered an adverse employment action; and 4) similarly situated others not in his protected class received more favorable treatment." *Brummett v. Lee Enters., Inc.*, 284 F.3d 742, 745 (7th Cir. 2002). As already discussed above, Williams has not established that he suffered any adverse employment actions while employed at Waste Management. His prima facie case fails as to the third element, and we need go no further in our analysis.

## III. Conclusion

For the foregoing reasons, we AFFIRM the decision of the district court to grant summary judgment in favor of Waste Management on all of Williams's claims.

A true Copy:

      Teste:

                _____

*Clerk of the United States Court of Appeals for the Seventh Circuit*