**Joanne ROMANISZAK–SANCHEZ, Plaintiff–Appellant,**

v.

**INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150, AFL–CIO, Defendant–Appellee.**

No. 04–1083.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 5, 2004.

Decided Jan. 13, 2005.

Rene Hernandez, Rockford, IL, for Plaintiff–Appellant.

Alexia M. Kulwiec, Legal Department, Countryside, IL, for Defendant–Appellee.

Before EASTERBROOK, MANION, and SYKES, Circuit Judges.

### ORDER

Joanne Romaniszak–Sanchez worked as a dispatcher for Local 150, International Union of Operating Engineers ("Local 150"), in Rockford, Illinois. The typical conversations among the employees at the Local 150 office featured a steady hum of profanity and sexual banter. Romaniszak–Sanchez occasionally engaged in those conversations. When Local 150 terminated Romaniszak–Sanchez for performance problems, she claimed sexual harassment was at the root of the decision. The district court disagreed and granted Local 150's motion for summary judgment. We affirm.

### I.

Local 150 hired Romaniszak–Sanchez as a dispatcher in its Rockford office in January of 1999. Her duties as a dispatcher included contacting union members, who were primarily heavy equipment operators, to send them to available jobs. She also answered questions from union members on a variety of topics. In addition, as a dispatcher she was responsible for maintaining the office files, answering the telephones, and taking and relaying messages to Local 150 business agents ("BAs"). The BAs were responsible for negotiating collective bargaining agreements, organizing non-union shops, and otherwise servicing

the Local 150 members. While the BAs could use dispatchers to assist them in administrative matters, the BAs were not responsible for hiring, firing, promoting, or demoting dispatchers. Supervision and oversight of dispatchers was assigned to two union officials: Bea McManus, who was not stationed at the Rockford office, was the head of the Local 150 dispatch department for most of the time that Romaniszak–Sanchez worked there, and Joe Ward, the Treasurer of Local 150, had oversight responsibility for the dispatchers.

Not long after she became a dispatcher, Romaniszak–Sanchez met Dominic Sanchez, one of the Local 150 members who worked through the Rockford office. In November 1999, Romaniszak–Sanchez and Sanchez got married.[1] After the marriage, Sanchez often visited Romaniszak–Sanchez while she was at work, usually staying a half an hour at a time. Sometimes, Sanchez's visits would last for more than an hour. In addition, Romaniszak–Sanchez's new step-daughter would occasionally stop by the office to talk as well, staying approximately a half-hour to forty-five minutes. While at the office, Romaniszak–Sanchez also called her own two children at least once a day.

Eventually, in February 2001, approximately two years after Romaniszak–Sanchez was first hired, Bea McManus responded to complaints about this conduct and met with Romaniszak–Sanchez at the Rockford office. Romaniszak–Sanchez understood this to be a serious matter, as, according to Romaniszak–Sanchez, "Bea only visits when there is a problem." McManus told Romaniszak–Sanchez that people complained about strange men loitering in the union hall and specifically informed Romaniszak–Sanchez that her hus-

band "can't just be hanging around the hall." According to Romaniszak–Sanchez, McManus indicated that "dispatchers could not be married to operators and that Dominic was not allowed to work in District 4 anymore." Later in the meeting, McManus instructed Romaniszak–Sanchez on how to file the office's papers, a fundamental part of her job that she was doing improperly. Romaniszak–Sanchez stated that she had never previously received training about how to file. The meeting lasted approximately forty-five minutes. Romaniszak–Sanchez was warned that if the problems regarding the loitering around the office continued, she could be terminated. Romaniszak–Sanchez did not make any complaints to McManus regarding either disagreeable language or sexual harassment during the course of the meeting.

There was no shortage of locker-room talk at Local 150 either before or after Romaniszak–Sanchez's marriage, however. A litany of expletives and profane words was prominent in business and social conversations at Local 150. When Romaniszak–Sanchez was first hired, Mike Milliken, one of the BAs, asked her if she would have a problem with the vulgar language routinely heard in the office, to which she responded, "no fucking problem." In addition to the coarse language, the BAs and members of Local 150 also discussed their sex lives, sexual acts, and sexual stories. Specifically, one of the BAs, Scott Dahl, would notice the different women who entered the Local 150 offices, commenting that he would "do" them. Dahl also told raunchy stories, such as one describing an old woman's genitalia. For the most part, these comments and stories were not made to Romaniszak–Sanchez, but, as they were

---

1. To avoid conflict, one of the BAs took over from Romaniszak–Sanchez the responsibility of assigning and dispatching Sanchez to jobs after the marriage.

made in her presence, she obviously heard them.

On occasion, however, some degrading sexual comments were directed at her. Dahl, for one, asked her "how big is that big Mexican really?" and requested that she sit on his lap to see what "pops up." In addition, he made comments about the size of Romaniszak–Sanchez's chest in a particular sweater and questioned what her genitals looked like. Local 150 members made several other lewd comments, including a general observation that women spent the first year of marriage "on their knees." Additionally, an unidentified person also made remarks about whether Romaniszak–Sanchez's daughter remained a virgin at seventeen years old.

But Romaniszak–Sanchez was not simply a silent observer. She admitted that she swore and used coarse language around the office, especially by the end of her tenure. At times, she would comment on attractive men who visited the Local 150 office, and while complimenting a Local 150 member on his voice, Romaniszak–Sanchez suggested that he belonged on a "hot line" or a "slut line" (a 1–900 number). Also, in response to Dahl's question about her genitals, Romaniszak–Sanchez responded that "they're shaved. They're none of your business."

Romaniszak–Sanchez never complained to McManus or Ward about any sexual harassment or profanity, though she had received the Local 150 sexual harassment policy, which provided a complaint procedure. She never made any complaints about the procedure. Romaniszak–Sanchez claimed that she objected to the BAs directly when they used the language, but that the language did not change. The BAs denied Romaniszak–Sanchez made any complaints about their language or alleged harassment.

In April 2001, the BAs met to discuss Romaniszak–Sanchez and decided to recommend her dismissal based on poor work performance. Three BAs, Mark McCaffrey, Joe Ross, and Dahl, were involved in this meeting. Milliken was not involved, as he was preparing to leave Local 150. McCaffrey, in particular, had problems with Romaniszak–Sanchez's typographical errors and the inaccuracy of the messages she took. The BAs then contacted Ward, Romaniszak–Sanchez's supervisor at the time, and recommended her termination. After concluding that the BAs were in agreement, Ward concurred. Local 150's attorney, Ken Edwards, was already on his way to the Rockford office, so he was asked to terminate Romaniszak–Sanchez, which Edwards did on June 4, 2001. At this meeting, they discussed neither her husband nor any complaints of sexual harassment.

Romaniszak–Sanchez filed several post-termination complaints regarding the conduct of individuals affiliated with Local 150. On June 27, 2001, Romaniszak–Sanchez filed a complaint with the Illinois Department of Human Rights. This complaint alleged four separate issues: sexual harassment, unequal pay, marital harassment, and discharge. The sexual harassment charge consisted of complaints that (1) a business agent "asked me if I had a little Mexican in me lately;" (2) Local 150 members/operators discussed her marital life; (3) "many other incidents involving Agents of another union;" and (4) foul language around the office. The marital status charge simply stated that McManus had told Romaniszak–Sanchez that marriages between operators and dispatchers were forbidden. The discharge claim asserted that she did not know why she was fired, but she believed it was on account of her marriage to an operator of Mexican ancestry.

Romaniszak–Sanchez's initial EEOC complaint recited slightly different claims. Specifically, she stated "I believe I have been discriminated against because of my marital association with an Hispanic, in violation of Title VII of the Civil Rights Act of 1964, as amended." Romaniszak–Sanchez filed a later EEOC complaint in November 2001, which considerably expanded her original statement. In this second EEOC complaint Romaniszak–Sanchez put forward three issues: (1) sexual harassment; (2) harassment due to race-related activity, marriage to an individual of Mexican descent, and marital status; and (3) discharge due to race-related activity, marriage to an individual of Mexican descent, and marital status. The sexual harassment claim was comprised of allegations that Tommy DalSanto and Bill Wood made sexually suggestive jokes and that the BAs used foul language. Neither DalSanto nor Wood were employees of Local 150. Romaniszak–Sanchez stated that she told the individuals involved to stop, but to no avail. In her racial harassment claim, Romaniszak–Sanchez stated that she was subjected to harassment by Wood concerning her husband's heritage, including the comment "have you had a little Mexican in you lately?" She then reported that others joked about her husband's Mexican heritage, without giving further information. Romaniszak–Sanchez's final claim contended that, while no reason was given for her discharge, she was actually discharged for marrying an operator of Mexican descent.

Romaniszak–Sanchez sued Local 150 in the Northern District of Illinois. She alleged sexual harassment and retaliation, in violation of Title VII. Local 150 moved for summary judgment, which the district court granted. Romaniszak–Sanchez appeals.

## II.

We review the district court's grant of summary judgment *de novo*, construing all facts in favor of Romaniszak–Sanchez, the nonmoving party. *See Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1028 (7th Cir.2004). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In short, summary judgment is warranted where "a rational trier of fact could not find for the non-moving party." *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir.2003).

Before this court, Romaniszak–Sanchez challenges the district court's decision that the incidents at Local 150 were not severe or pervasive enough to constitute sexual harassment. Romaniszak–Sanchez also asserts, regarding the retaliation claim, that the district court's finding of waiver was incorrect.

### A.

■ The district court correctly concluded that Romaniszak–Sanchez was not subject to actionable sexual harassment. To establish a *prima facie* case of sexual harassment under a hostile work environment theory, Romaniszak–Sanchez must demonstrate:

(1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on the individual's sex; (3) the sexual harassment had the effect of unreasonably interfering with the Plaintiff's work performance in creating an intimidating, hostile or offensive working environment that affected seriously the

psychological well being of the plaintiff; and (4) there is a basis for employer liability. *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354–55 (7th Cir.2002).

In evaluating whether the conduct rises to the level of a hostile environment, we examine "all the circumstances including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." *Smith v. N.E. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir.2004) (quoting *Russell v. Bd. of Trs. of Univ. of Ill. at Chicago*, 243 F.3d 336, 343 (7th Cir.2001)). "Moreover, a hostile work environment is one that is 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Hilt–Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir.2002) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

Romaniszak–Sanchez fails to establish several necessary elements of her hostile work environment claim. First, as the district court found, the comments at issue were not severe or pervasive. The bulk of Romaniszak–Sanchez's complaints about Local 150 did not involve specific sexual comments, but more generalized complaints of rampant profanity. Title VII does not impose a legal duty to purify the language of the workplace of profanity. *See, e.g., Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1010 (7th Cir.1994); *Minor v. Ivy Tech State Coll.*, 174 F.3d 855, 858 (7th Cir. 1999); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430–31 (7th Cir.1995). Further, most of the sexually charged comments were not directed at Romaniszak–Sanchez. While it is unfortunate that Romaniszak–

Sanchez had to hear such things, we have consistently considered the impact of this "second-hand" harassment as less objectionable than harassment directed at the plaintiff herself. *See McKenzie v. Milwaukee County*, 381 F.3d 619, 624 (7th Cir.2004); *Smith*, 388 F.3d at 567 ("There is no hostile work environment where as here, the harassment about which [plaintiff] complains was not directed at her."). This leaves only a handful of comments of a sexual nature made by Local 150 employees to Romaniszak–Sanchez. Specifically, Dahl commented on her chest in a sweater, her genitals, and her sexual relationship with her husband. Based on the factors we enunciated in *Smith*, we cannot say that the few sexual comments by Dahl spread over a long period of time rise to the level of actionable harassment. *See Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir.2002) ("To substantiate her claim, Patt points to eight gender-related comments made by Scher during the course of her employment. Several of these comments ... are indeed offensive, but these comments were too isolated and sporadic to constitute severe or pervasive harassment.") While offensive, these comments were too infrequent to demonstrate a hostile work environment under Title VII.

Moreover, while it is likely that the comments made to Romaniszak–Sanchez were not "welcome," neither were they so offensive as to be obviously harassing. This type of sexual banter was common in the office. The comments were made in the context of stupid jokes and were clearly not serious or threatening. "As some courts have noted, the sporadic use of abusive language, gender-related jokes, and occasional teasing are fairly commonplace in some employment settings and 'do not amount to actionable harassment.'" *Savino v. C.P. Hall Co.*, 199 F.3d 925, 933 (7th Cir.1999) (quoting *Breeding v. Arthur*

*J. Gallagher & Co.*, 164 F.3d 1151, 1159 (8th Cir.1999)). And in this workplace, it appears that Romaniszak–Sanchez was a willing participant in some of the sexual banter. She swore around the office. She commented on men whom she found attractive, telling Wood that his voice belonged on a "hot line" or "slut line." Instead of rejecting Dahl's foul inquiries, she responded to them. She never complained to her supervisors. She also admitted that she routinely laughed off sexually suggestive comments. All in all, Romaniszak–Sanchez's conduct indicates that the comments were not the type of unwelcome verbal approaches that typically create a hostile sexual environment.

█ A final flaw in Romaniszak–Sanchez's hostile work environment claim is that she fails to establish employer liability. "An employer's liability for hostile environment sexual harassment hinges on whether the harasser is the victim's supervisor or merely a co-employee." *Hall*, 276 F.3d at 355. This court has defined a supervisor as one with the "power to hire, fire, demote, promote, transfer, or discipline an employee." *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1034 (7th Cir.1998). In this case, the BAs who were involved did not have any power to hire, fire, promote, or demote Romaniszak–Sanchez, though they could make recommendations. Absent actual authority, these BAs must be considered co-employees for purposes of Local 150's liability. *See Hall*, 276 F.3d at 355.

Local 150 is liable for any alleged harassment by the BAs if Local 150 was negligent either in discovering or remedying the harassment. *See Williams*, 361 F.3d at 1029. "Notice or knowledge of the harassment is a prerequisite for liability," and the employer must provide a reasonable channel to receive any complaints. *Parkins*, 163 F.3d at 1035. A plaintiff,

however, cannot withstand summary judgment without showing evidence that she gave the employer enough information to make a reasonable employer believe that she was being sexual harassed. *See Hall*, 276 F.3d at 356; *Gawley v. Ind. Univ.*, 276 F.3d 301, 312 (7th Cir.2001) ("As an incentive to employers who implement reasonable procedures designed to prevent harassment of employees, there will be no liability if employees fail to take advantage of the procedures."). In this case, the parties do not dispute that Local 150 had a sexual harassment policy and that Romaniszak–Sanchez received a copy of it. This policy provided procedures to follow for sexual harassment complaints. Romaniszak–Sanchez decided to ignore this policy. She made some complaints about foul language to her co-workers, but this is not sufficient to put Local 150 on notice of a problem. As Romaniszak–Sanchez did not supply information to apprise Local 150 of the possible problem, she cannot show employer liability.

**B.**

█ The district court also acted properly when granting summary judgment to Local 150 on the retaliation claim. "[A] Title VII plaintiff may bring only those claims that were included in her EEOC charge, or that are like or reasonably related to the allegations of the charge and growing out of such allegations." *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 689 (7th Cir.2001). Before the district court, Romaniszak–Sanchez claimed that she was retaliated against for complaining about alleged sexual harassment. She had never made these types of retaliation complaints before the EEOC, claiming instead that she was discharged because of discriminatory animus towards her interracial marriage and husband. These claims involve two very different theories: one discrimi-

nation, one retaliation. "An EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals." *Haugerud,* 259 F.3d at 689. Here, there is no connection between the charge made in the EEOC complaint, which focused on racial and marital issues, and the present retaliation claim that Local 150 fired Romaniszak–Sanchez in response to her complaints about sexual harassment. Not only do the two claims assert different theories, they each introduce different facts to support those theories. Quite simply, the retaliation claim before this court does not involve the same conduct or individuals as the retaliation claim brought before the EEOC. There is no basis in the EEOC retaliation charge for inferring that Romaniszak–Sanchez was terminated because of complaints about sexual harassment.

Romanisak–Sanchez tries to reconstruct her retaliation claim by relying on the sexual harassment charges in her EEOC complaints. However, a court cannot infer retaliation from a different claim, such as sexual harassment. *See O'Rourke v. Cont'l Cas. Co.,* 983 F.2d 94, 97 (7th Cir. 1993) (refusing to infer retaliation from a claim of age discrimination). Only in those cases where claims not explicitly set forth in an EEOC complaint "reasonably could be expected to grow out of an EEOC investigation of the [initial EEOC] charge" can this inference be made. *Peters v. Renaissance Hotel Operating Co.,* 307 F.3d 535, 550 (7th Cir.2002). Otherwise, such an inference would ignore the fundamental purposes of the rule requiring a plaintiff to assert claims first before the EEOC—to allow the EEOC to act in its investigatory and conciliatory role and to provide notice to the party against whom the complaint is filed. *See Steffen v. Meridian Life Ins. Co.,* 859 F.2d 534, 544 (7th Cir.1988). Here, the factual allegations in the EEOC sexual harassment claim would alert neither the EEOC nor Local 150 to a potential retaliation claim. In the course of three separately filed EEOC/IDHR charges, Romaniszak–Sanchez complains only once of an inappropriate remark of a sexual nature by a Local 150 employee (whom she does not identify). Instead, in her EEOC complaints, she primarily concerns herself with foul language by Local 150 BAs and sexually suggestive comments by non-employees. In her final, most detailed, charge, for example, Romanisak–Sanchez made absolutely no allegations regarding inappropriate conduct, outside of bad language, by Local 150 employees.

In short, the EEOC sexual harassment claims offered no hint of a possible retaliation claim relating to any sexual harassment by Local 150. Simply referring to EEOC sexual harassment charges cannot salvage a later developed retaliation claim roughly relating to those charges. This claim is therefore waived.

### III.

While Local 150 is not an ideal workplace, Romaniszak–Sanchez failed to demonstrate that she was subject to a hostile working environment. Romaniszak–Sanchez also waived her retaliation claim based on her alleged complaints about sexual harassment because she never raised this retaliation claim before the EEOC. Therefore, the judgment of the district court is

AFFIRMED