**Gregory R. McGEE, Plaintiff,**

**v.**

**WISCONSIN BELL, INC., Defendant.**

**No. 03–C–745–C.**

United States District Court,
W.D. Wisconsin.

Dec. 16, 2004.

Gregory R. McGee pro se.

Laura A. Lindner, Lindner & Marsack, S.C., Milwaukee, WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action in which plaintiff Gregory R. McGee is suing defendant Wisconsin Bell, Inc., for alleged violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e. Plaintiff contends that because he is an African–American male he was (1) subject to a hostile working environment; (2) not given an ergonomic chair; and (3) terminated. Presently before the court is defendant's motion for summary judgment. Jurisdiction is present. 28 U.S.C. § 1331.

Defendant's motion will be granted. Plaintiff has failed to adduce evidence showing that a reasonable person would have found the "harassment" to which plaintiff was subjected so severe and pervasive as to alter the conditions of plaintiff's work environment. In addition, defendant is entitled to summary judgment on plaintiff's claims that he was denied a particular chair and later terminated because of his race or gender because plaintiff has failed to satisfy his burden under either the direct or indirect method of proof.

With respect to the direct method, plaintiff has failed to adduce direct or circumstantial evidence of discrimination. Plaintiff failed to make out a prima facie case under the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), because he failed to show that he was meeting defendant's legitimate job expectations or that he was treated differently from similarly situated employees not in his protected classes. Finally, defendant has submitted evidence demonstrating that it denied plaintiff's request for an ergonomic chair because he did not submit the requisite medical documentation defendant requested of him and that it terminated plaintiff because of his poor performance. Plaintiff has not shown either of these reasons to be pretextual.

Both sides submitted proposed findings of fact, as they are permitted to do under this court's procedures. *See Procedure to Be Followed on Motions for Summary Judgment*, I.A.2; II.B, *attached to* Preliminary Pretrial Conference Order, dkt. # 9. However, plaintiff failed to respond to defendant's proposed finding of fact. As a result, I must find that all of defendant's proposed findings of fact are undisputed unless they conflict with facts in plaintiff's own proposed findings or unless they are not properly supported. *Stewart v. McGinnis*, 5 F.3d 1031, 1034 (7th Cir.1993). In addition, plaintiff has included a number of proposed "disputes" of fact in which he makes arguments that are not supported by any record evidence. *See* Plt.'s PFOF in Plt.'s Br., dkt # 23, at 5–6, ¶¶ 52–57. Because these proposed findings lack evidentiary support, they will not be considered. Finally, plaintiff has made a number of factual assertions in his brief that were not contained in his proposed findings of fact.

I find from the parties proposed findings that the following facts are undisputed.

## UNDISPUTED FACTS

### A. *The Parties*

Plaintiff Gregory R. McGee is an African–American male employed by defendant Wisconsin Bell, Inc. as a technical associate in its field dispatch center in Madison, Wisconsin from January 18, 2001 through July 11, 2001. Defendant provides local telephone service in the state of Wisconsin.

Plaintiff was one of approximately seven technical associates employed at the Madison dispatch center. When he first began working for defendant, plaintiff reported to Janelle Hubeny, who co-managed the Madison dispatch center with Brian Washington. In early May 2001, plaintiff began reporting to Washington, who is also an African–American male. Throughout his employment, plaintiff was a member of the Communication Workers of America, District 4. The terms and conditions of his employment were governed by a collective bargaining agreement between this union and defendant.

Technical associates are responsible for certain administrative duties associated with processing customer service requests and repair and installation orders. (Defendant refers to service, repair and installation orders as "tickets.") Each technical associate is assigned a daily list of tickets that he or she must review and assign to technicians at one of defendant's approximately 120 central offices. Technical associates also receive a daily list indicating which technicians are working at each central office that day. Ticket assignment decisions are to be made according to the location, the nature of the work to be performed and the availability of technicians capable of performing the work.

Each ticket contains information identifying the central office where the work described on the ticket must be performed. The proper assignment of tickets to technicians is critical to defendant's success. Incorrect ticket assignments increase the amount of time that it takes defendant to provide customer service.

### B. *Hot Cut Tickets*

A "hot cut" ticket refers to a service order from a customer who has decided to switch local phone service providers from defendant to one of its competitors. When a customer changes telephone service providers, defendant and the new provider coordinate the transfer of service and set a time period within which service is to be changed. Once the time period to switch service is set, Wisconsin state regulations provide a narrow window of time for defendant to complete the transfer. These time windows range from one to three hours depending on the number of lines being switched. The Wisconsin Public Service Commission, which regulates the provision of local telephone service in Wisconsin, can impose substantial monetary fines if ninety-five percent of all hot cut transfers are not made on time. Thus, accuracy and timeliness in making assignments are particularly important when they involve hot cut tickets.

Plaintiff knew that defendant had to meet certain time deadlines for completing hot cut orders and that it could be fined for failing to do so. He also knew that if a hot cut ticket required work outside regular hours (8:00 a.m. to 5:00 p.m.), the technical associate assigning the ticket was required to give personal notice to the technician or manager of the central office to which the ticket is assigned.

### C. *Coaching for Performance Problems*

Shortly after Washington began direct supervision of plaintiff, he began noticing errors in plaintiff's ticket assignments.

On May 14, 2001, plaintiff assigned a hot cut ticket to a technician at a Milwaukee central office, instead of the Madison central office where the work needed to be performed. As a result, defendant missed the deadline for transferring the customer's service. Two days later, plaintiff made the same mistake but it was caught in time to meet the deadline.

On May 16, 2001, Washington met with plaintiff to discuss these errors and the importance of assigning tickets to the correct central office and technician. Plaintiff told Washington that he believed he had misread the technician information because his trainer was pushing him to work too quickly. In addition, plaintiff was adjusting to his first pair of reading glasses, although he did not mention this to Washington. (The parties dispute as to whether plaintiff told Washington that he thought that he had received enough training. *Compare* McGee Depo., dkt. # 16 at 91–92 ("I didn't ever say I had enough training"), *with* Washington Decl., dkt. # 21, at 4, ¶ 19 ("McGee told me that he had received adequate training to perform his work ...").) Washington then asked plaintiff's trainer, Joann Malec, to join the meeting. In Malec's presence, Washington told plaintiff that he should focus on accuracy over speed in assigning tickets. Washington suggested that plaintiff take notes as he was being trained. Plaintiff said that he understood his mistakes and would make a greater effort to improve.

The next day, Washington became aware of additional tickets that plaintiff had processed incorrectly. In one instance, a central office duty manager notified Washington that a hot cut ticket had been assigned to his central office but not to any of his technicians. In another instance, plaintiff failed to notify the assigned technician or central office of a hot cut transfer requiring work during non-regular hours. Defendant missed the deadline for transferring the customer's service. Washington met with plaintiff again to review the errors and teach plaintiff the proper procedure for processing after-hours hot cut tickets. Plaintiff stated again that he felt stressed and that his mistakes occurred because Malec was pushing him to work too fast. He asked to move to another work station that was not directly across from Malec. Washington emphasized to plaintiff that he should work as slowly as necessary to avoid making mistakes, made suggestions to help plaintiff accurately read ticket information, such as using the computer cursor on his computer screen or highlighting paper print-outs and asked to see plaintiff's training notes to make sure that he was getting appropriate training and that his notes reflected proper procedures. In addition, Washington granted plaintiff's request to be transferred to a different work station and suggested that plaintiff call the employee assistance program if he needed help coping with stress.

### D. *Verbal Warning*

On May 18, 2001, the day after Washington had coached plaintiff on processing after-hours hot cut tickets, plaintiff again failed to give personal notice to either the assigned technician or central office manager of an after-hours hot cut ticket. That same day, plaintiff assigned a ticket for work by the Janesville central office to a technician assigned to the Appleton/Green Bay central offices. On May 21, 2001, plaintiff assigned a ticket for work at the Milwaukee central office to a technician at a Madison central office and assigned a ticket for work in Appleton to a technician located at a Fond Du Lac central office.

On May 22, 2001 Washington met with plaintiff and his union steward, Anna Curkeet, to discuss plaintiff's most recent mistakes and determine why various remedies

previously discussed with plaintiff had been unsuccessful. Plaintiff offered several explanations for his continued accuracy problems: he felt residual stress from having been counseled the week before; his roommate was moving out; his trainer was pressuring him to work at a faster pace than he felt comfortable with; he had just moved to another work station and had not yet acclimated; and he did not have an ergonomically correct work station.

Washington questioned some of plaintiff's explanations and reminded plaintiff that he had been instructed to focus on accuracy over speed and that plaintiff would be allowed additional time to work on his ticket list to insure accurate assignment if necessary. He also asked plaintiff whether he thought he needed any additional training to perform his duties correctly and plaintiff responded that he did not. Washington advised plaintiff again that the employee assistance program was available to help him deal with stress. In addition, he gave plaintiff a verbal warning that his performance had to improve. Plaintiff told Washington that he was confident that he could avoid making the same mistakes. With the agreement of plaintiff's union steward, Washington told plaintiff that he was to make no more than three mistakes in assigning tickets for the duration of the week.

At the end of the week, Washington reviewed a sample of plaintiff's work and found two instances in which plaintiff had assigned tickets to technicians in the wrong central office. Washington met with plaintiff and told him that with his improvement, Washington expected plaintiff to reduce his error rate to zero.

### E. *One Day Suspension and Final Warning*

When Washington reviewed plaintiff's performance several weeks later, he discovered that plaintiff continued to make the same mistakes and with increasing frequency. On June 20, 2001, plaintiff assigned a ticket to a technician who was not working in the central office where the work needed to be performed. The following day, he assigned five tickets to technicians in the wrong central offices. In addition, plaintiff made three mistakes with regard to a "high capacity" ticket. First, plaintiff was not trained to process high capacity tickets and had been instructed not to try to do so. Second, he did not assign the ticket to an experienced high capacity technician. (The daily technician list designates which of the available technicians are capable of servicing high capacity tickets.) Third, plaintiff assigned the ticket to a technician in Milwaukee, instead of Madison, where the work needed to be performed.

As a result of plaintiff's continued performance problems, Washington suspended plaintiff for one day and gave him a final warning that if he did not show significant improvement in the quality of his work, further disciplinary action would be taken, up to and including dismissal. Plaintiff served his suspension on June 26. The following day, Washington met with plaintiff and his union steward to reconfirm his performance expectations. Washington told plaintiff that his work on the ticket list would be monitored and that he could not have more than five errors during the five work days between June 27 and July 3. (Plaintiff has attempted to dispute Washington's sworn statement that he told plaintiff of the fewer than five errors standard, *see* Washington Decl., dkt. # 21, at 10, ¶ 5, with his own deposition testimony in which he stated that he did not recall whether Washington made this expectation clear, *see* Plt.'s Dep., dkt. # 16, at 140. In the face of unequivocal testimony on a subject, the testimony of a party disclaiming knowledge about that

subject cannot create a genuine issue of fact. *Unterreiner v. Volkswagen of America, Inc.,* 8 F.3d 1206, 1211 (7th Cir.1993).) No other technical associate at the Madison dispatch center was making, or allowed to make daily errors in assigning tickets.

### F. *Termination*

During the five-day review period, Washington found that plaintiff made eight errors in processing tickets. Plaintiff assigned four tickets to the wrong central office and one to a technician who was on vacation and not on the daily technician list. In addition, plaintiff failed to notify an assigned technician that a customer had cancelled a switch-service request. As a result, the customer's business had no telephone service for more than three hours. On two additional occasions, he delayed notifying assigned technicians of cancelled switch-service requests for approximately five hours. By the time the technicians learned of the cancellations, both customers' service had been cut. In addition to these errors, Washington observed that plaintiff was not properly managing his ticket list. At any given time, a technical associate should not have a backlog of more than one to two pages of tickets to process and generally, tickets should be processed within two hours. When Washington spoke to plaintiff at 3:30 p.m. on June 28, 2001, plaintiff had five pages of tickets on his list. When they spoke again an hour later, at 4:30 p.m., plaintiff had eight pages of tickets, many of which had been pending for more than two hours.

Washington decided to terminate plaintiff's employment after concluding that plaintiff was continuing to have problems with accuracy and not working at an acceptable pace despite repeated coaching and corrective disciplinary action. Washington notified plaintiff of his termination

on July 11, 2001. At the time of his termination, plaintiff was fully trained and knew how to perform his job. Plaintiff thinks that one of his errors was caused because he tripped over a hole in the floor.

### G. *Comparable Error Rates*

Plaintiff filed a grievance contesting his termination under his union's collective bargaining agreement. In connection with that grievance, Washington measured the technical associate error rate in assigning a sample of hot cut tickets. Washington reviewed a sample of 193 tickets on the hot cut list for the week of May 7, 2001. During that week, the three technical associates working on the hot cut list (Malec, Backus, and Peterson) made no errors. Next, Washington reviewed a sample of 199 tickets on the hot cut list during the week of June 18, a week when plaintiff worked on the list. During that week, plaintiff made five errors and neither of the other two technical associates working on the list made any errors. Finally, Washington reviewed hot cut ticket assignments for the week of July 16, 2001, the week after plaintiff's termination. None of the technical associates working on the list that week made any mistakes processing any of the 124 hot cut tickets. The Communication Workers of America did not pursue plaintiff's grievance.

### H. *Job Accommodation Request*

In late April or early May 2001, plaintiff contacted defendant's medical absence and accommodations resource team, requesting an ergonomic chair for his back and a desk that would elevate to allow him to work while standing. Plaintiff had been diagnosed with sacroiliac joint dysfunction. His accommodation request was assigned to Kimberly Lukanic, a job accommodations consultant. On May 2, 2001, Lukanic sent plaintiff a letter, telling him that he would need to submit objective medical documentation showing that the accommo-

dations he had requested were medically necessary. In addition, Lukanic informed plaintiff that he must submit his medical documentation within thirty days of the date on which he submitted his request and that if he failed to do so, his request would be considered rescinded. Lukanic enclosed a generic instructions form indicating that plaintiff's medical submissions were due on May 31, 2001.

Pursuant to standard departmental practice, Lukanic notified Washington that plaintiff had requested a job accommodation and that she was in the process of evaluating plaintiff's request. According to Wisconsin Bell's policy, if the accommodations team determines that the accommodation request is medically substantiated, it consults the employee's supervisor to determine whether an accommodation can reasonably be made. If the team determines that the request is not medically substantiated, it will close the accommodation request. An employee's supervisor has no role in determining whether a request is medically necessary.

On May 17, 2001, plaintiff sent Lukanic a four-page fax, which included a letter dated May 15, 2001 from chiropractor John Emmerich and a description of interferential muscle stimulation. The letter provides as follows:

> Greg McGee entered this office on 3–7–96 for evaluation and treatment of lower back pain. Before seeking treatment in this office he was seen by a medical doctor, who prescribed muscle relaxants, as well. Greg received chiropractic spinal manipulation, as well as, interferential muscle stimulation. Greg's treatment was not completed due to an independent medical examination that was ordered by the worker's compensation carrier. The worker's compensation carrier felt that the patient had reached a healing plateau and did not require further treatment. However, low back symptoms persisted, and apparently Greg is continuing to experience low back pain. Thus, I recommend an ergonomic chair to support the structure of Greg's low back to mitigate further symptoms.

Emmerich's letter did not address plaintiff's request for an adjustable desk. Prior to May 15, 2001, plaintiff had not seen Emmerich since 1996. Between 1996 and May 15, 2001, plaintiff did not see any other doctors or chiropractors for treatment of back pain.

On May 22, 2001, Lukanic informed plaintiff that Emmerich's May 15, 2001 letter was not sufficient to grant his accommodation request. On May 24, 2001, Lukanic sent Emmerich a fax requesting a medical diagnosis and any supporting chart notes and diagnostic test results. In addition, she asked Emmerich if he was recommending a particular kind of ergonomic chair, and if so, to provide details. Lukanic did not receive a response to this facsimile and on May 31, 2001, she called Emmerich's office. The following day, Emmerich returned her call and informed her that he did not have time to respond to the questions in her May 24 letter. He also said that he had not seen plaintiff since 1996 and was not able to provide updated information on the condition of his back. On June 4, 2001, Lukanic informed plaintiff that Emmerich was not willing to provide additional medical information. Plaintiff said he would talk to Emmerich.

On June 6, Lukanic again told plaintiff that if he had another doctor who would be willing to provide medical documentation of his back problems, she would consider his accommodation request. Plaintiff told Lukanic that he did not think his condition was that serious and that he would attempt to purchase an ergonomically correct chair on his own. Lukanic told plain-

tiff that she would close his file, which she did the next day. Lukanic then notified Washington that the matter was closed.

On June 15, 2001, plaintiff left Lukanic a message, indicating that he had a doctor's appointment on July 2 to obtain information relating to his request for an ergonomic chair and asking that his file be reopened. Three days later, Lukanic told plaintiff that if he submitted medical documentation in support of his accommodation request, she would review and consider it.

At plaintiff's request, Washington contacted defendant's safety and health department and requested an ergonomic evaluation of plaintiff's work station. On June 27, 2001, Debra Sirovina, an employee in the safety and health department, came to the Madison dispatch center and evaluated plaintiff's work station and plaintiff's body position for about an hour. Sirovina made some adjustments to plaintiff's work station and told him not to wear a weight lifting belt anymore. Plaintiff thinks that these adjustments may have caused additional strain on his back. Sirovina recommended that plaintiff be provided half roll lumbar support pillow to provide his back additional support but she did not recommend that plaintiff be given a different chair. (Plaintiff received the pillow shortly after Sirovina made her recommendation.) On June 28, 2001, Lukanic received Sirovina's report about plaintiff's work station.

At plaintiff's July 2 appointment, Emmerich took x-rays of plaintiff's back. On July 3, plaintiff called Lukanic to ask her to obtain additional medical information from his doctor and gave her a phone number. When Lukanic made this call, she was told that plaintiff had had x-rays taken on July 2, but that the doctor had not yet had an opportunity to write a report of his findings, and probably would not be able to do so until the end of the

week. On July 5, Lukanic called plaintiff's doctor again, to ask for the doctor's interpretation of plaintiff's x-rays. Lukanic never received any x-rays, an x-ray report or any other medical information from plaintiff or his doctor to substantiate plaintiff's need for an ergonomic chair. All of the technical associates at the Madison field dispatch center have the same basic work station and none had or were given the type of ergonomic chair plaintiff requested. Lukanic does not know plaintiff's race. (Plaintiff asserts in his brief that he told Lukanic that he is African–American. However, he has not proposed this as a fact or cited to any admissible evidence.)

### I. *Other*

Defendant's regional manager, Sean Boyle, and Washington gave plaintiff what he perceived to be cold stares.

Washington asked plaintiff if he was from "here." Plaintiff is originally from Chicago, Illinois and thinks that people in Madison, Wisconsin stigmatize people from Chicago. As plaintiff understood Washington's question, "here" referred to Wisconsin.

At some point, Malec said to Joe Kocvara (presumably one of defendant's employees), "the way they're treating him, it's discriminatory."

Hubeny made plaintiff feel self-conscious about being the only man in the group and on one occasion, asked him to un-do the bun in his hair and show his ponytail.

None of defendant's employees ever made any derogatory comments to plaintiff about his race or his gender.

### OPINION

█ Plaintiff brought this suit under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e. To establish defendant's liability under ʰthis statute,

plaintiff must demonstrate that his race or gender was a motivating factor in defendant's actions. *Venters v. City of Delphi,* 123 F.3d 956, 973 n. 7 (7th Cir.1997). He can make this showing either directly by presenting evidence that race was the motivating factor in defendant's decision or indirectly, using the burden-shifting method of proof set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) (citing 42 U.S.C. § 2000e–5(g)(2)(B)); *Williams v. Waste Management of Illinois,* 361 F.3d 1021, 1034 (7th Cir.2004); *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1397 (7th Cir.1997);.

## A. Direct Method

■ Defendant argues that plaintiff has no direct evidence of discrimination and therefore, must resort to the indirect method of proof. However, "[u]nder the direct method, the plaintiff may show either through direct *or circumstantial* evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose." *Haywood v. Lucent Technologies, Inc.,* 323 F.3d 524, 529 (7th Cir.2003) (emphasis added); *see also Sartor v. Spherion Corp.,* 388 F.3d 275, 278 (7th Cir.2004); *Gusewelle v. City of Wood River,* 374 F.3d 569, 574 (7th Cir. 2004); *Davis v. Con–Way Transportation Central Express, Inc.,* 368 F.3d 776, 783 (7th Cir.2004); *Buie v. Quad/Graphics, Inc.,* 366 F.3d 496, 503 (7th Cir.2004) (ADA); *Wyninger v. New Venture Gear, Inc.,* 361 F.3d 965, 978 (7th Cir.2004); *Rhodes v. Illinois Dept. of Transportation,* 359 F.3d 498, 504 (7th Cir.2004); *Troupe v. May Department Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994).

■ Plaintiff does not contend that he has circumstantial evidence of discrimina-tion. Instead, he argues that Malec's statement, "the way they're treating him, it's discriminatory" qualifies as direct evidence. "[D]irect evidence should prove the particular fact in question without reliance upon inference or presumption." *Lim v. Trustees of Indiana University,* 297 F.3d 575, 580 (7th Cir.2002) (internal quotations omitted); *see also Troupe v. May Department Stores,* 20 F.3d 734, 736 (7th Cir.1994). In the context of a Title VII case, direct evidence " 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.' " *Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir.2003) (quoting *Radue v. Kimberly–Clark Corp.,* 219 F.3d 612, 616 (7th Cir.2000)). Malec's statement does not amount to such an admission for several reasons.

■ First, Malec did not make either of the employment decisions about which plaintiff complains. Although the statements of a person who provides critical information to the actual decision makers may qualify as direct evidence in some circumstances, *Hunt v. City of Markham,* 219 F.3d 649, 652 (7th Cir.2000), there is no evidence that Malec had any influence on Washington's decision to terminate plaintiff or Lukanic's decision to deny plaintiff's request for an ergonomic chair. Second, even if it would be reasonable to infer that because Malec was plaintiff's trainer, she had some say in the termination decision, her statement is not an admission of her own discriminatory feelings but an opinion about the improper motives of others. The distinction is not a trivial one; although a person always knows her own thoughts, she cannot testify about the motives of others unless she has evidence showing personal knowledge about their thoughts. Fed.R.Evid. 602. Although Malec's statement is not hearsay because she is an agent of defendant, Fed.

R.Evid. 801(d)(2)(D), there is no evidence showing that she has reason to know what Lukanic was thinking when she denied plaintiff's job accommodation request or what Washington was thinking when he decided to terminate plaintiff. *Cf. Wells v. Unisource Worldwide, Inc.,* 289 F.3d 1001, 1006–07 (7th Cir.2002) (co-worker's assertions that decision maker had a "problem with [African Americans]" insufficient to establish pretext); *Oest v. Illinois Dept. of Corrections,* 240 F.3d 605, 615 (7th Cir. 2001) (uncorroborated generalities of disparate treatment are insufficient to support a Title VII case).

Finally, the Court of Appeals for the Seventh Circuit has held that direct evidence must " 'relate to the specific employment decision in question.' " *Cowan v. Glenbrook Sec. Services, Inc.,* 123 F.3d 438, 443 (7th Cir.1997) (quoting *Randle v. LaSalle Telecomm., Inc.,* 876 F.2d 563, 569 (7th Cir.1989)). Plaintiff has failed to adduce evidence that might reveal whether Malec was referring to the chair denial, plaintiff's termination or something entirely different. Because plaintiff has failed to show that he was denied an ergonomic chair or terminated because of his race or gender under the direct method, he must resort to the indirect burden-shifting method.

### B. *Indirect Method*

In order to make out a prima facie case under the indirect method of proof, plaintiff must show that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably. *Haywood,* 323 F.3d at 530 (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). If plaintiff makes out a prima facie case, he is entitled to "a presumption that the employer unlawfully discriminated against the employee." *EEOC v. Our Lady of the Resurrection Medical Center,* 77 F.3d 145, 148 (7th Cir.1996) (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

However, defendant may rebut the presumption by coming forward with a legitimate nondiscriminatory reason for the discharge. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. "The defendant need not persuade the court that it was actually motivated by the proffered reasons;" instead, the defendant need raise only a genuine issue of fact as to its motive. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant satisfies this standard, plaintiff cannot succeed unless he shows that the proffered reasons were pretext. *Id.* Pretext means more than just a decision made in error or in bad judgment; it means a lie or a phony reason for the action. *Wolf v. Buss (America), Inc.,* 77 F.3d 914, 919 (7th Cir.1996). "Although the burden of production shifts under [the indirect] method, 'the burden of persuasion rests at all times on the plaintiff.' " *Haywood,* 323 F.3d at 531 (quoting *Klein v. Trustees of Indiana Univ.,* 766 F.2d 275, 280 (7th Cir.1985)).

### 1. *Legitimate job expectations*

Defendant argues that plaintiff cannot make out a prima facie case of discrimination because he cannot prove that he was meeting defendant's legitimate expectations or that similarly situated employees were treated differently. Plaintiff has responded by rewriting the applicable standards. According to plaintiff, he does not need to show that he was meeting defendant's legitimate job expectation if he can show that his "job performance was impeded by the lack of tools that [he] should have be[en] given a fair chance of

getting." Plt.'s Br., dkt. # 23, at 2. (The "tool" to which plaintiff is referring appears to be an ergonomic chair.) I will construe plaintiff's argument as a challenge to the legitimacy of defendant's expectations but I must reject it. Plaintiff has not shown that he was not given a "fair chance" of getting the ergonomic chair he thought he needed. He did not apply for the chair during the first four months of his employment. As soon as he did, he was informed that he would need to provide objective medical evidence that his request was medically necessary. If his back injury was so severe that it rendered him unable to type accurately, he should have been able to obtain such information. Plaintiff never submitted the appropriate documentation.

Moreover, it is undisputed that plaintiff's "typographical" errors in ticket assignments were costly to defendant. His mistakes prevented defendant from providing prompt customer service and exposed it to steep fines. Plaintiff does not suggest any reason other than not having an ergonomic chair why he could not satisfy the low error rate that defendant expected. On these facts, there is no basis for concluding that defendant's performance expectations were not legitimate. *Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742, 746–47 (7th Cir.2002) (employee could not show that employer set him up to fail or gave him tasks he could not have completed in allotted time); *Sargis v. Amoco Corp.*, 996 F.Supp. 790, 794–95 n. 8 (N.D.Ill.1998) (relevant issue is whether employer's expectations were attainable and sincere, not whether employee had explanation for failure).

## 2. *Similarly situated co-workers*

█ Plaintiff has also failed to meet his burden to show that similarly situated employees were treated differently. In his brief, plaintiff asserts that "Buffy Westrich was given 5 days off without being stepped to dismissal, where I needed those days to expedite the x-ray supplemented application to the accommodations department, but was not allowed to. Also they were not made conscious of their gender and made fun of and teased." Plt.'s Br., dkt. # 23, at 3. As I explained above, facts contained only in a brief will not be considered. Plaintiff did not propose any facts about Westrich or any other technical associate being given days off, provide any citation to any admissible evidence to support his assertion or supply any information about the reason for the five day absence. Unless the five days were to allow Westrich to obtain medical documentation to support a job accommodations request, then plaintiff was not treated differently. Plaintiff has adduced no evidence that any other technical associate was granted a job accommodation request without submitting medical documentation or was held to a more lenient rate of error.

## 3. *Legitimate non-discriminatory reason*

Even if plaintiff had made out a prima facie case, defendant has provided legitimate nondiscriminatory explanations for its actions: it denied plaintiff's request for an ergonomic chair pursuant to its standard practice of requiring applicants for job accommodation to provide medical documentation showing that the request is medically necessary and it terminated plaintiff because of his rate of error. Defendant has supported these assertions with substantial evidence showing plaintiff's numerous ticket-assignment errors and his failure to submit the appropriate medical documentation for his chair request.

## 4. *Pretext*

█ Plaintiff has provided a litany of explanations for his poor performance:

new reading glasses, tripping over a hole in the floor, a roommate moving out and an uncomfortable chair. However, a showing of pretext requires much more; a pretext is more than an oddity or a lapse in good judgment. *Grube v. Lau Industries,* 257 F.3d 723, 730 (7th Cir.2001); *Jordan v. Summers,* 205 F.3d 337, 343 (7th Cir.2000). Instead, it means a lie or dishonest explanation. *Kulumani v. Blue Cross Blue Shield Association,* 224 F.3d 681, 685 (7th Cir.2000). To show pretext, plaintiff must demonstrate that defendant's articulated reasons (1) had no basis in fact; (2) did not actually motivate defendant; or (3) were insufficient to motivate his discharge. *Wells,* 289 F.3d at 1006 (citing *Velasco v. Illinois Dept. of Human Services,* 246 F.3d 1010, 1017 (7th Cir.2001)). Plaintiff gave defendant explanations that, if believed, may have provided a reason for defendant to gamble on plaintiff's ability to get his performance deficiencies under control; this does not come close to showing pretext.

▮▮▮▮ Although not required to do so under Title VII, defendant has submitted evidence suggesting that its decisions are consistent with sound business judgment. Plaintiff's mistakes were costly to defendant and its customers. The evidence suggests that his rate of error was significantly higher than his co-workers. In addition, defendant has submitted evidence showing that it took pains to accommodate plaintiff. Lukanic took steps on plaintiff's behalf to obtain medical documentation in support of his application for an ergonomic chair. Washington allowed plaintiff to change offices, gave him additional training and warned him about his performance deficiencies. Finally, defendant made adjustments to plaintiff's office to make it more comfortable for him.

"Title VII is not a 'good cause' statute; it creates a remedy against invidious discrimination[ ], not against caprice." *Pryor v. Seyfarth, Shaw, Fairweather & Geraldson,* 212 F.3d 976, 979 (7th Cir.2000). Plaintiff cannot succeed on a claim under Title VII simply by showing that defendant could have made more accommodations or excused his poor performance for a longer time. Because plaintiff has failed to adduce evidence from which a jury could conclude that his race or gender had anything to do with the denial of his accommodations request or his termination, defendant is entitled to summary judgment on plaintiff's claims that he was denied a chair and terminated because of his race and gender.

### C. Hostile Environment

▮▮▮▮ To survive summary judgment on a hostile work environment claim under Title VII, the employee must show: "(1) he was subject to unwelcome harassment; (2) the harassment was based on his race [or gender]; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability." *Williams v. Waste Management of Illinois,* 361 F.3d 1021, 1029 (7th Cir.2004); *see also Mason v. Southern Illinois Univ. at Carbondale,* 233 F.3d 1036, 1043 (7th Cir.2000). With respect to the severe and pervasive prong, a plaintiff must show that the work environment was "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Cerros v. Steel Technologies, Inc.,* 288 F.3d 1040, 1045 (7th Cir.2002). In determining whether a party has made this showing, courts examine "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

*Russell v. Bd. of Trustees of Univ. of Illinois at Chicago,* 243 F.3d 336, 343 (7th Cir.2001) (internal citations omitted).

In his response brief, plaintiff provides just one sentence in support of his hostile work environment claim. He states that "[he] claims the sexually hostile work environment because the pressure and attention given and directed to [his] being the only male in the group by my manager Janelle Hubeny." (Because plaintiff does not even mention a racially hostile environment, I will consider that claim waived.) In support of the only proposed finding of fact on point, plaintiff cites to a portion of his deposition in which he testified that he could not recall what Hubeny might have said that made him feel self-conscious but that "being the male in a group of women has—or in that situation, understandably, had a little bit of polarized energy, if you will." Plt.'s Dep., dkt. # 16, at 258–59. He went on to say that he "picked up a little bit of that energy from ... a couple of the interpersonal dynamics, I picked up a little bit of that once or twice." *Id.* at 260. It goes without saying that feeling a "little bit" of polarized energy "once or twice" is not even close to the showing of objective hostility required. Although Hubeny did encourage plaintiff to let out his hair bun, this is an innocuous comment that has no apparent relationship to plaintiff's gender without additional evidence of context. Finally, it is undisputed that none of defendant's employees ever made any derogatory comments to plaintiff about his race or his gender. Because no reasonable jury could conclude that plaintiff was subjected to a hostile work environment, as that term is defined in the Title VII context, defendant is entitled to summary judgment.

## ORDER

IT IS ORDERED that defendant Wisconsin Bell, Inc.'s motion for summary judgment is GRANTED with respect to plaintiff Gregory R. McGee's claims that he was denied an ergonomic chair, subjected to a hostile work environment and terminated because of his race and gender. The clerk of court is directed to enter judgment in favor of defendant and close this case.